805 P.2d 603

**LOVELACE MEDICAL
CENTER, Petitioner,**

v.

**Jacob MENDEZ and Maria Mendez,
Individually and as parents of
Joseph Mendez, Respondents.**

No. 18766.

Supreme Court of New Mexico.

Jan. 7, 1991.

Rodney, Dickason, Sloan, Akin & Robb, W. Robert Lasater, Jr., Ellen G. Thorne, Albuquerque, for petitioner.

Stephen G. Durkovich, Albuquerque, for respondents.

Miller, Stratvert, Torgerson & Schlenker, Alice Tomlinson Lorenz, Albuquerque, for Amicus Curiae New Mexico Medical Soc.

## OPINION

MONTGOMERY, Justice.

We granted certiorari to consider the following two questions of substantial public interest:[1] (1) Did the court of appeals have jurisdiction to entertain petitioner's application for interlocutory appeal, even though the application was granted more than twenty days after it was filed? (2) On the merits, may the parents of a normal, healthy baby conceived as a result of a negligently performed, unsuccessful sterilization operation recover the costs of raising the child from birth to adulthood?

The court of appeals held that the answer to both questions is yes and reversed the district court's partial summary judgment in favor of the defendant hospital. We agree with the court of appeals, though on a somewhat different rationale as to the jurisdictional point, and remand the case to the district court for trial.

### I.

Joseph Mendez was conceived after his mother, Maria Mendez, underwent a tubal ligation, which allegedly was negligently performed by a physician employee of the defendant, Lovelace Medical Center. The physician found and ligated only one of Maria's two fallopian tubes and then failed

---

1. As contemplated by NMSA 1978, Section 34–5–14(B)(4) (Repl.Pamp.1990).

to inform her of the unsuccessful outcome of the operation. She thus remained fertile, took no birth-control precautions, and conceived Joseph in due course. He was born as a normal, healthy baby.

Some additional facts bearing on this appeal are recited in the court of appeals' opinion (authored by Judge Alarid, concurred in by Judge Chavez), which, with one deletion, we attach as an appendix to this opinion. As noted in Judge Alarid's opinion, the district court in Mr. and Mrs. Mendez's medical malpractice action against Lovelace granted its motion for partial summary judgment, holding as a matter of law that the costs of raising Joseph to majority were not recoverable. The court certified its order as appropriate for interlocutory appeal, and the court of appeals granted the plaintiffs' application for appeal on the twenty-eighth day after the application was filed. Under the statute relating to interlocutory appeals, NMSA 1978, Section 39–3–4 (Orig.Pamp.), an application not acted upon within twenty days after it is filed "shall be deemed denied."

In its opinion, the court of appeals first addressed the question whether, in light of the twenty-day limitation in the statute, it had jurisdiction over the appeal. It held that it did, relying chiefly on the rule in *Ammerman v. Hubbard Broadcasting, Inc.*, 89 N.M. 307, 551 P.2d 1354 (1976), that only this Court has the power to regulate pleading, practice and procedure in the courts. We agree with the court of appeals' ruling that it had jurisdiction, but reach that result through somewhat different reasoning. Accordingly, the court's discussion of jurisdiction in its opinion is omitted from the appendix, and our own analysis follows in Part II of this opinion.

On the merits, we find ourselves in substantial agreement with Judge Alarid's opinion and accordingly reproduce all of Part II of that opinion in the appendix. In addition to Judge Alarid's analysis, we have some comments of our own to contrib-

ute to the already voluminous debate[2] on the question whether child-rearing expenses are recoverable in an action for "wrongful conception." We shall set out these comments in Part III of this opinion.

## II.

■ In ruling that it had jurisdiction over this interlocutory appeal, the court of appeals took note of the rule adopted by this Court in our Rules of Appellate Procedure relating to interlocutory appeals. SCRA 1986, 12–203 provides that an appeal from an interlocutory order in a civil case, where the order contains the certification contemplated by Section 39–3–4(A), may be initiated by filing an application with the appellate court clerk within ten days after entry of the order in the district court. The rule goes on to prescribe the persons on whom copies of the application shall be served, the content and form of the application, the time within which a response must be filed, and the effect of a grant of the application on further proceedings in the district court. Most of the provisions of Rule 12–203 supplement, and do not duplicate, the provisions of the statute. The statutory provision, "If an application has not been acted upon within twenty days, it shall be deemed denied," is not contained in the rule.

The court of appeals noted this inconsistency—if it can be called that—between the rule and the statute, and held: "Because the Rules of Appellate Procedure govern over inconsistent statutes, and because our rules contain no time limit for acting on an interlocutory appeal application, we hold this court has jurisdiction over the appeal in this case."

As noted previously, the court of appeals relied principally on *Ammerman v. Hubbard Broadcasting, Inc.* in reaching its result. *Ammerman* states, among other things:

Under the [New Mexico] Constitution, the legislature lacks the power to prescribe by statute rules of practice and

2. See the extensive lists of cases and law review articles cited in the footnotes to Judge Alarid's opinion.

procedure, although it has in the past attempted to do so. Certainly statutes purporting to regulate practice and procedure in the courts cannot be made binding, for the constitutional power is vested exclusively in this court.

89 N.M. at 311, 551 P.2d at 1358 (quoting and reaffirming *State ex rel. Anaya v. McBride*, 88 N.M. 244, 246, 539 P.2d 1006, 1008 (1975)). In recent years, this doctrine has come under sharp attack as representing a departure from coordinate rulemaking power shared by the legislature and the judiciary. *See generally* Browde & Occhialino, *Separation of Powers and the Judicial Rule–Making Power in New Mexico: The Need for Prudential Constraints*, 15 N.M.L.Rev. 407 (1985); *Maples v. State*, 110 N.M. 34, 37, 791 P.2d 788, 791 (1990) (dissenting opinion).

To resolve the jurisdictional issue in this case we need not go as far as the above-quoted statement in *Ammerman* and *McBride*. In order to conclude that the twenty-day limitation in Section 39–3–4 divested the court of appeals of jurisdiction, it is necessary to construe that limitation as an attempt by the legislature to define appellate jurisdiction over interlocutory appeals. It is certainly possible to construe the statute in this fashion, but it is not inevitable; and there are good reasons for construing it simply as the legislative adoption of a housekeeping rule to assist the courts with the management of their cases, to have effect unless and until waived by a court in a particular case or modified by a rule of this Court on the same subject.

If the statutory provision *were* intended by the legislature to have jurisdictional effect, then presumably we would accord it that effect—unless we were to hold it unconstitutional under *Ammerman*. The appellate jurisdiction of both this Court and the court of appeals is within the legislative power to prescribe. N.M. Const. art. VI,

§§ 2, 29. *See also State v. Arnold*, 51 N.M. 311, 314, 183 P.2d 845, 846 (1947): "The creating of a right of appeal is a matter of substantive law and outside the province of the court's rule making power." In *State v. Arnold*, this Court observed that "reasonable regulations affecting the time and manner of taking and perfecting the [appeal] are procedural and within this court's rule making power." 51 N.M. at 314, 183 P.2d at 846–47. However, to characterize the twenty-day limitation in Section 39–3–4 as a regulation affecting the time and manner of taking the appeal does not answer the question of whether or not it is jurisdictional. If it is jurisdictional, then it is within the legislature's constitutional power to prescribe; it if is not jurisdictional, then it did not limit the court of appeals' jurisdiction in this case and it was subject to relaxation by that court and to this Court's delegated power to modify by supervening court rule.

■ We see no indication that the legislature intended this provision to limit the appellate courts' jurisdiction over interlocutory appeals. For one thing, construing the provision as jurisdictional will defeat many appeals on procedural grounds, and it is this Court's policy to construe both statutes and court rules in favor of deciding an appeal on the merits whenever possible. *See Olguin v. State*, 90 N.M. 303, 305, 563 P.2d 97, 99 (1977) (policy of construing rules liberally in order to determine causes on their merits); *Jaritas Live Stock Co. v. Spriggs*, 42 N.M. 14, 16, 74 P.2d 722, 722–23 (1937) (same). For another thing, construing the provision as jurisdictional brings us face to face with an *Ammerman* constitutional challenge, either on the broad ground quoted above (exclusive power in the courts to regulate procedure) or on the narrower ground—which was also present in *Ammerman*, 89 N.M. at 312–13, 551 P.2d at 1359–60 [3]—that the provision

---

**3.** This second aspect of *Ammerman* was our holding that the statute in question in that case (NMSA 1953, Repl.Vol. (1970), Section 20–1–12.-1(C) (Supp.1975)) was unconstitutional because it purported to require that an appeal from a district court's order of disclosure of evidence protected under the statute be heard *de novo*

and within twenty days from docketing of the appeal. *See also State ex rel. Bliss v. Greenwood*, 63 N.M. 156, 162, 315 P.2d 223, 227 (1957) (statutory regulation invalid if it does not enable court effectively to administer its judicial functions); *Southwest Underwriters v. Montoya*, 80 N.M. 107, 109, 452 P.2d 176, 178 (1969)

would attempt to regulate the appellate process itself and thereby intrude directly into the separation of powers established by the New Mexico Constitution (Article III, Section 1). It is, of course, a well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions. *See Huey v. Lente,* 85 N.M. 597, 598, 514 P.2d 1093, 1094 (1973); *State ex rel. Sanchez v. Stapleton,* 48 N.M. 463, 472, 152 P.2d 877, 882 (1944).

We think that the legislature did not intend the twenty-day requirement in Section 39–3–4 to be a limitation on the appellate courts' jurisdiction, conferred by that section, over interlocutory appeals. We think rather that the legislature intended this requirement to provide the courts with a mechanism for disposing of cases in which interlocutory appeal applications are not acted upon within some defined period of time and for informing the district courts when they are free to resume processing cases they have certified as appropriate for interlocutory appeal.[4] The requirement, in other words, was intended to assist the courts with the management of their cases in the absence of some other provision, not to limit the courts' jurisdiction.

As so construed, the requirement was subject to modification by Supreme Court rule—whether consistent, inconsistent or neutral in relation to the statute—and to relaxation by the court for whose benefit the statute was enacted. As to modification by court rule, we note first that our legislature has since 1933 delegated to this Court—to the extent delegation was necessary or appropriate—the power to promulgate rules regulating pleading, practice and procedure in the courts for the purpose of simplifying and promoting the speedy de-

termination of litigation upon its merits. 1933 N.M. Laws, ch. 84, § 1 (compiled as NMSA 1978, § 38–1–1 (Repl.Pamp.1987)). Section 2 of that act (compiled as NMSA 1978, § 38–1–2) provides: "All statutes relating to pleading, practice and procedure, now existing, shall, from and after the passage of this act, have force and effect only as rules of court and shall remain in effect unless and until modified or suspended by rules promulgated pursuant hereto." (Promulgated, that is, by the Supreme Court under Section 38–1–1.) Although Section 38–1–2 refers to statutes existing in 1933, we think it fair to attribute to the legislature, in view of the delegation in Section 38–1–1, the intent that statutes relating to pleading, practice and procedure enacted *after* 1933 would remain in effect "unless and until modified or suspended by rules" promulgated pursuant to Section 38–1–1.

Consistent with these statutes, this Court in 1960 promulgated the rule that now appears as SCRA 1986, 1–091, which provides:

All statutes relating to pleading, practice and procedure in judicial proceedings in any of the courts of New Mexico, existing upon the taking effect of [Sections 38–1–1 and –2] . . ., and all statutes since enacted by any session of the legislature relating to said subjects, . . . except as any of said statutes . . . hereafter may be amended or vacated by order of this court, shall remain and be in effect and have full force and operation as rules of court.

This rule dovetails with Sections 38–1–1 and –2 and reflects a consistent intention on the part of the legislature and this Court that legislative rules relating to pleading, practice and procedure in the

---

(legislation unconstitutional if it touches upon rules of pleading, practice and procedure essential to performance of courts' constitutional duties).

4. This is so even though Section 39–3–4(C) provides that an application does not stay proceedings in the district court unless so ordered by the district or an appellate judge. As a practical matter, the pendency of an application for interlocutory appeal will inhibit the district courts

from proceeding with management of cases certified, even though proceedings may not be formally stayed. A mechanism for knowing when an application has been "deemed denied" due to passage of time will be useful to the district courts—or so the legislature could reasonably have thought—and also to the parties, as, for example, in knowing when a petition for a writ of certiorari may be filed.

courts, particularly where those rules relate to court management or housekeeping functions, may be modified by a subsequent rule promulgated by the Supreme Court.

As has been noted, Rule 12–203 does not provide any time period in which an application for interlocutory appeals must be acted upon. This silence may be deemed a modification of Section 39–3–4, or it may simply reflect the absence of any provision, one way or the other, governing the time within which an application must be granted or denied. If it is the former, then, as the court of appeals held below, the rule has superseded the statute and the court of appeals had jurisdiction to grant the application in this case even though more than twenty days had elapsed. If it is the latter, then the statutory provision remains in effect as a rule of court, but it may be waived or relaxed by the court for whose benefit it is intended, in the absence of abuse of discretion or prejudice to a party.

■ In *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970), the United States Supreme Court noted the "general principle" that

> [i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party.

*Id.* at 539, 90 S.Ct. at 1292 (quoting *NLRB v. Monsanto Chem. Co.*, 205 F.2d 763, 764 (8th Cir.1953)). This principle was cited and relied on by our court of appeals in *James v. Brumlop*, 94 N.M. 291, 294, 609 P.2d 1247, 1250 (Ct.App.), *cert. denied*, 94 N.M. 674, 615 P.2d 991 (1980).

While the principle as stated applies mainly to a court's application or relaxation of its *own* rule, not a rule of a higher authority, we think it can be applied to a situation such as the one here, in which a directive has been adopted in large part for the benefit of the court which seeks to relax it. *See* 21 C.J.S. *Courts* § 132 (1990): "Rules which are merely directory, or which are prescribed solely for the convenience of the court, may be dispensed with when the ends of justice so require...." *See also Byard F. Brogan, Inc. v. Holmes Elec. Protective Co.*, 501 Pa. 234, 241, 460 A.2d 1093, 1096 (1983): "[L]ower courts may extend or refuse to extend the time within which to meet a filing requirement so long as the action taken does not amount to an abuse of discretion which causes manifest and palpable injury to one of the parties."

In this case there is no claim, nor any indication, that the court of appeals' taking an extra eight days to grant the Mendezes' application for interlocutory appeal had any prejudicial effect on Lovelace, except, of course, for the fact that Lovelace ultimately lost the appeal on the merits. Lovelace filed no motion in the court of appeals to dismiss the interlocutory appeal and fully briefed the issues on the merits, adding an assertion of untimeliness only in its brief. The failure to file a motion to dismiss did not, of course, preclude it from raising lack of jurisdiction—in its brief, at oral argument, or in any other way. Lovelace's action in litigating on appeal the issue on its merits does, however, illustrate the point that it suffered no prejudice from the court of appeals' sua sponte extension of time for granting the application for interlocutory appeal.

We affirm the court of appeals' decision that it had jurisdiction over this appeal.

### III.

#### A.

■ As noted previously, we are in substantial agreement with most of Judge Alarid's opinion for the court of appeals and have set forth that portion of the opinion, which we adopt,[5] in the appendix.

---

**5.** As will be noted shortly, there is one exception to our adoption of Judge Alarid's opinion: the statements that the term "injury" means the wrongful or tortious act and that the injury in this case consisted of the physician's wrongful acts.

We particularly agree with Judge Alarid that the fundamental question on the merits issue in this appeal is a question as to measure of damages. Given that a tort has occurred (the doctor's negligence in performing the sterilization operation and failing to inform the mother of the unsuccessful outcome) and given that an injury has resulted from this tort (the mother's continued fertility, despite her desire and effort to be sterilized), what is the measure of damages to compensate her for the injury she has suffered? As Judge Alarid points out, it is virtually undisputed that *some* elements of damages are compensable for this tort—*e.g.*, Mrs. Mendez's pain and suffering associated with her pregnancy and Joseph's birth; the cost of a subsequent sterilization; and her expenses, including lost wages, associated with the pregnancy and the birth. To be sure, the most controversial item of claimed damage—the cost of raising Joseph to adulthood—is the critical issue in this case; but it is an issue primarily involving quantification of the plaintiff's loss.

■ Thus, when the trial court, in entering partial summary judgment in favor of Lovelace, held that the birth of a child was not a "compensable legal harm," it was addressing the wrong issue. The question is not whether the birth of the baby is a legal harm, or an injury; it is whether the damages that may be awarded for the harm that indisputably was inflicted on Mrs. Mendez extend to the reasonable costs of raising the baby to adulthood. For the same reason, we think Chief Judge Bivins, who dissented in the court of appeals, was mistaken in his view that the birth of a normal, healthy child is not a legally cognizable harm. Once again, it is not the birth of the child that is the harm; it is, as we explain below, the invasion of the parents' interest in the financial security of their family—an invasion clearly foreseeable (or at least reasonably to be foreseen, as a jury might determine) by the doctor as the probable consequence of his negligence in performing the procedure in question.

■ In this general connection, and despite our agreement with most of what Judge Alarid says, we must take the opportunity to disapprove his statement that "the term 'injury' in tort law refers to the wrongful act or tort itself." This statement is made in response to the views of Judge Bivins and the district court that the birth of a normal, healthy child is not, as a matter of law, an injury. Judge Alarid's response cites *Clark v. Cassetty*, 71 N.M. 89, 376 P.2d 37 (1962), but *Clark* does not stand for the proposition for which it is cited. This Court in *Clark* did distinguish an "injury" from ensuing or concomitant "damage," a distinction that has considerable validity, even though the two terms, in the past, have often been used interchangeably. *See, e.g., Black's Law Dictionary* 924 (4th ed. 1968).[6] However, it is clear from *Clark* itself that the wrongful act—the tort, which in that case was defendant's driving his truck with a defective muffler—is *not* the same as the resulting injury—which in *Clark* was the fire caused by the muffler's coming into contact with the plaintiff's wheat stubble. 71 N.M. at 92, 376 P.2d at 39. In this case, the wrongful act was Lovelace's negligent performance of the sterilization operation and subsequent failure to inform Mrs. Mendez that she was still fertile. To determine what "injury" she suffered as a result of those wrongful acts and how the associated damages are to be measured requires a bit more discussion, to which we now turn.

### B.

Mrs. Mendez's injury—indeed, the injury of both Mr. and Mrs. Mendez—can probably be described in various ways, but one of the most helpful analytical tools for a description is that contained in the *Restatement of Torts:* "The word 'injury' is used ... to denote the invasion of any legally protected interest of another." *Restatement (Second) of Torts* § 7(1) (1965). The

6. Compare *Black's Law Dictionary* 785 (6th ed. 1990): "Injury. Any wrong or damage done to another, either in his person, rights, reputation, or property. The invasion of any legally protected interest of another. Restatement, Second, Torts, § 7."

section goes on to distinguish the word "harm," which "is used ... to denote the existence of loss or detriment in fact of any kind to a person resulting from any cause." *Id.* § 7(2).

The comments to this section of the *Restatement* explain how the concept of "harm" differs from that of "injury":

> "[H]arm" implies the existence of loss or detriment in fact, which may not necessarily be the invasion of a legally protected interest. The most usual form of injury is the infliction of some harm; but there may be an injury although no harm is done....
>
> ... Acts or conditions which affect the personal tastes, likes, or dislikes of a person may be either beneficial to him, or detrimental, or of no consequence, the same as acts which affect physical things. In so far as these acts or conditions are detrimental to him, he suffers harm. Thus harm ... is the detriment or loss to a person which occurs by virtue of, or as a result of, some alteration or change in his person, or in physical things, and also the detriment resulting to him from acts or conditions which impair his physical, emotional, or aesthetic well-being, *his pecuniary advantage,* his intangible rights, his reputation, or his other legally recognized interests....
>
> ....
>
> ... Harm, like injury, is not necessarily actionable. Both, to be actionable, must be legally caused by the tortious conduct of another. In addition, harm, which is merely personal loss or detriment, gives rise to a cause of action only when it results from the invasion of a legally protected interest, which is to say an injury. [Emphasis added.]

*Id.,* comments a, b, d.[7]

Applying this analysis to Mr. and Mrs. Mendez's situation following her unsuccessful sterilization operation, we believe the couple suffered at least two forms of harm. First, as indicated previously, Mrs. Mendez remained fertile despite her desire to be infertile. From the standpoint of the couple, their desire to limit the size of their family—to procreate no further—was frustrated. Within the *Restatement's* definition of harm, this was a loss or detriment to them.

Second, their interest in financial security—in the economic stability of their family—was impaired. The undesired costs of raising another child to adulthood—costs which they had striven to avoid and had engaged Lovelace to help them avert—were suddenly thrust upon them. This was a detriment to their pecuniary advantage—*i.e.,* harm. Was it legally compensable—*i.e.,* an injury, an invasion of a legally protected interest?

As a leading treatise on tort law states, "Individuals have many interests for which they claim protection from the law, and which the law will recognize as worthy of protection." W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 3, at 16 (5th ed. 1984). However, it is clear that not all interests which individuals claim as worthy of legal protection are in fact afforded such protection under our law. For example, this Court has held that a wife's (presumably, either spouse's) interest in her spouse's consortium is not an interest which will be given legal protection, at least when it is invaded by an unintentional or negligent act. *See Tondre v. Thurmond–Hollis–Thurmond, Inc.,* 103 N.M. 292, 706 P.2d 156 (1985); *Roseberry v. Starkovich,* 73 N.M. 211, 387 P.2d 321 (1963). Similarly, our court of appeals has declared that it "look[s] with disfavor on claims for damages based on alienation of affections." *Thompson v. Chapman,* 93 N.M. 356, 358, 600 P.2d 302, 304 (1979) ("In our judgment, the interests which the action seeks to protect are not protected by its existence, and the harm it engenders far outweighs any reason for its continuance.") (quoting *Wyman v. Wallace,* 15 Wash.App. 395, 401, 549 P.2d 71, 74 (1976)). On the other hand, this Court recognized a claim for the negli-

---

**7.** It is apparent from this discussion that the *Restatement's* distinction between "injury" and "harm" is very close to, if not the same as, the distinction between "injury" and "damage" as recognized in *Clark v. Cassetty, supra.*

gent infliction of emotional distress where family members witnessed the death of a another family member in an accident in *Ramirez v. Armstrong*, 100 N.M. 538, 541, 673 P.2d 822, 825 (1983) (overruled in part by *Folz v. State ex rel. Highway Dept.*, 110 N.M. 457, 797 P.2d 246 (1990)). "The existence of a marital or intimate familial relationship is the nucleus of the personal interest to be protected. The tort of negligent infliction of emotional distress is a tort against the integrity of the family unit." *Ramirez*, 100 N.M. at 541, 673 P.2d at 825.

In holding that Mr. and Mrs. Mendez could not recover the costs of rearing Joseph to majority, the district court was declaring, in effect, that their interests in financial security and in limiting the size of their family were not worthy of legal protection.

We agree with the court of appeals that the district court was mistaken in so holding. The interest in one's economic stability is clearly an example of an interest that receives legal protection in a wide variety of contexts. *See, e.g., Sharon Steel Corp. v. Lakeshore Inc.*, 753 F.2d 851 (10th Cir. 1985) (New Mexico tort law supports recovery for economic loss in the product liability context); *Schmitz v. Smentowski*, 109 N.M. 386, 399, 785 P.2d 726, 739 (1990) ("palpable economic injury" suffered where plaintiffs were unreasonably forced to pay a mortgage in full, jeopardizing their ranching business); *Williams v. Ashcraft*, 72 N.M. 120, 381 P.2d 55 (1963) (recogniz-

ing the tort of wrongful interference with another's business relations); *Baros v. Kazmierczwk*, 68 N.M. 421, 429, 362 P.2d 798, 804 (1961) (recovery for loss of earning capacity). In the context of a negligently performed, unsuccessful sterilization operation, the Supreme Court of Wisconsin has very recently held that the costs of raising the child to majority may be recovered because, among other things:

> Individuals often seek sterilization precisely because the burdens of raising a child are substantial and they are not in a position to incur them....
>
> ... [T]he love, affection, and emotional support they [the parents] are prepared to give do not bring with them the economic means that are also necessary to feed, clothe, educate and otherwise raise the child. That is what this suit is about.... Relieving the family of the economic costs of raising the child may well add to the emotional well-being of the entire family, including this child, rather than bring damage to it.

*Marciniak v. Lundborg*, 153 Wis.2d 59, 67, 450 N.W.2d 243, 246 (1990).[8]

Other courts have allowed recovery of child-rearing costs based at least in part on the recognition that an interest to be protected in this setting is the parents' desire to safeguard the financial security of their family. *See, e.g., Burke v. Rivo*, 406 Mass. 764, 551 N.E.2d 1 (1990) (but allowing offset for emotional benefits); *University of Ariz. Health Sciences Center v. Superior*

---

**8.** Chief Judge Bivins in his dissent below observed that the court of appeals' decision constituted New Mexico as "a minority of one" in recognizing the undiminished costs of rearing a normal and healthy child conceived after a failed sterilization procedure. With the *Marciniak* case, Wisconsin has joined this distinguished minority. Several other states authorize recovery of child-rearing expenses but require an offset for the emotional benefits to be derived from the birth of the unplanned child. See the cases cited in the last paragraph of footnote 1 in Judge Alarid's opinion in the appendix, *infra*. We address below the subject of offsetting benefits.

The statement in *Marciniak* that relieving the family of the economic costs of raising the child might add to the emotional well-being of the entire family, including the child, answers an

argument vigorously asserted by Lovelace on this appeal. The argument is that recognition of the tort of wrongful conception, which we do in this case, and awarding child-rearing costs as the measure of damages flowing from the tort, is against public policy because it will harm the child emotionally when, later on, he or she learns that the parents sued someone for causing his or her conception. *See also Burke v. Rivo*, 406 Mass. 764, 771, 551 N.E.2d 1, 4–5 (1990): "The once unwanted child's knowledge that someone other than the parents had been obliged to pay for the cost of rearing him or her may in fact alleviate the child's distress at the knowledge of having been once unwanted. In any event, it is for the parents, not the courts, to decide whether a lawsuit would adversely affect the child and should not be maintained." (citation omitted).

*Court,* 136 Ariz. 579, 667 P.2d 1294 (1983) (en banc) (allowing offset for benefits); *Ochs v. Borrelli,* 187 Conn. 253, 259, 445 A.2d 883, 885–86 (1982) ("raising a child from birth to maturity is a costly enterprise, and *hence injurious,* ... parental pleasure softens but does not eradicate economic reality") (emphasis added).

In some of these cases, the courts have required that concern for economic factors must have motivated the decision to seek sterilization in order for recovery of child-rearing expenses to be awarded. *See, e.g., Burke,* 406 Mass. at 773, 551 N.E.2d at 6; *University of Ariz. Health Sciences Center,* 136 Ariz. at 585, 667 P.2d at 1300; *Jones v. Malinowski,* 299 Md. 257, 270, 473 A.2d 429, 436 (1984). These cases rely on *Hartke v. McKelway,* 707 F.2d 1544 (D.C. Cir.1983), in which the mother's reason for sterilization was therapeutic—*i.e.,* to avoid the danger to herself from pregnancy—and the court held that, the danger not having materialized and a healthy baby having been born, "the jury could not rationally have found that the birth of this child was an injury to this plaintiff. Awarding child-rearing expenses would only give Hartke a windfall." 707 F.2d at 1557.

The reasoning in *Jones* has much to commend it:

> [T]he assessment of damages associated with the healthy child's birth, if any, should focus upon the specific interests of the parents that were *actually* impaired by the physician's negligence, *i.e.,* was the sterilization sought for reasons that were (a) genetic—to prevent the birth of defective child, or (b) therapeutic—to prevent harm to the mother's health or (c) economic—to avoid the additional expense of raising a child. [Emphasis in original.]

299 Md. at 270–71, 473 A.2d at 436. However, we are reluctant to hold that child-rearing expenses are recoverable only when the parents' sole, or even primary, motivation is economic. A person's original reasons for seeking sterilization should not be conclusive as to whether an economic interest has been injured. A professional woman, for example, might seek sterili-

zation for a reason unrelated to financial hardship. However, if a negligently performed sterilization results in an unexpected birth, her financial situation and even long-term prospects may abruptly change. On a practical note, the motivation rule entails difficult tasks for the jury in sorting out the parents' differing motivations and encourages after-the-fact reformulations of the parents' actual intentions. In any event, in *this* case we need not struggle with these difficulties, because the record before the district court on Lovelace's motion for summary judgment established that a powerful, if not the only, motive for Maria Mendez's seeking sterilization was to conserve family resources.

We hold, therefore, that the Mendezes' interest in the financial security of their family was a legally protected interest which was invaded by Lovelace's negligent failure properly to perform Maria's sterilization operation (if proved at trial), and that this invasion was an injury entitling them to recover damages in the form of the reasonable expenses to raise Joseph to majority.

### C.

This holding is sufficient to dispose of the merits issue in this case, but we wish to add a few words on the second interest previously identified as having been harmed by Lovelace's negligent conduct— the parents' interest in limiting the size of their family. Like the interest in financial security, the interest in family planning has in recent years received extensive—indeed, constitutional—protection in the courts. *See, e.g., Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In *Ochs v. Borrelli,* the Supreme Court of Connecticut recognized "that parents have a constitutionally protected interest located 'within the zone of privacy created by several fundamental constitutional guarantees,' to employ contraceptive techniques to limit the size of their family." 187 Conn. at 258, 445 A.2d

at 885 (citations omitted) (quoting *Griswold*, 381 U.S. at 485, 85 S.Ct. at 1682). Similarly, the Supreme Court of Ohio has commented: "The choice not to procreate, as part of one's right to privacy, has become (subject to certain limitations) a Constitutional guarantee." *Bowman v. Davis*, 48 Ohio St.2d 41, 46, 356 N.E.2d 496, 499 (1976) (limited in *Johnson v. University Hospitals of Cleveland*, 44 Ohio St.3d 49, 540 N.E.2d 1370 (1989)).

We have no hesitancy in concluding that in addition to the injury inflicted on them by the invasion of their interest in financial security, Mr. and Mrs. Mendez suffered an injury through the invasion of their legally protected interest in limiting the size of their family.

However, we admit to far less certainty as to the measure of the damages that flow from such an injury, if and to the extent that such damages differ from (exceed) the damages flowing from their economic injury. We have said that Mrs. Mendez is entitled to damages for the pain and suffering, if any, that were associated with her pregnancy and Joseph's birth. What other elements of damage should be awarded to her and her husband for invasion of their interest in family planning? Put another way, what kind of harms, in addition to economic loss, are compensable for an injury of this type?

In *Burke v. Rivo*, the Massachusetts Supreme Court cited cases allowing recovery of various elements of damage for a negligent sterilization, including the mother's physical pain and suffering and mental anguish, the father's loss of consortium, various economic costs, and emotional distress during pregnancy. 406 Mass. at 767–69, 551 N.E.2d at 3. The court stated that the lower court in that case had properly recognized that the damages would include various economic costs as well as the husband's loss of consortium, and added to these "the wife's pain and suffering in connection with the pregnancy and birth and with the second sterilization procedure. We also see no reason why the plaintiffs should not recover for emotional distress they sustained as a result of the unwanted pregnancy." *Id.* at 769, 551 N.E.2d at 3–4.

There is at least a potential difference of opinion between the Massachusetts court in *Burke* and the court of appeals in this case. Damages for emotional distress sustained as a result of an unwanted pregnancy could include psychological burdens from the presence of an additional child until that child's majority, recovery for which is clearly precluded under Judge Alarid's opinion. There might be other detriments flowing from the addition of a child to the family, such as diminution of attention and affection to other children.

All of these nonpecuniary harms resulting from interference with the parents' interests in limiting the size of their family would, we think, properly be subject to mitigation or offset under the *Restatement* rule cited by Judge Alarid:

> When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.

*Restatement (Second) of Torts* § 920 (1979).

As comments a and b to this section, and Judge Alarid's opinion, make clear, this "offsetting benefits" principle applies only to reduction of damages for invasion of the same interest as the one that has been harmed. It thus, in theory, would permit proof of emotional and psychological benefits to the parents from the birth of the additional child to offset the same kind of detriments, but not to offset detriments flowing from invasion of a different interest, such as the interest in financial security. A trial over such issues, however, could result in the unseemly spectacle of the parents' attempting to prove how slight or nonexistent was the psychological benefit they derived from their additional child in order to minimize the offset to their nonpecuniary interests. We hold that permitting such a dispute to be litigated would be contrary to public policy. *See*

*Burke v. Rivo*, 406 Mass. at 774, 551 N.E.2d at 6–7 (dissenting opinion). We therefore agree with the court of appeals that the emotional distress, if any, caused by an additional child is not compensable.[9] We also agree, applying Section 920 of the *Restatement*, that the emotional benefits from having an additional (healthy) child do not mitigate the economic costs of rearing the child. For the same reason, and also because of the rule preventing recovery for negligently caused loss of consortium, *Roseberry v. Starkovich*, 73 N.M. at 215–18, 387 P.2d at 324–26, we hold that damages for such loss, in this context, may not be recovered.

As for the parents' emotional "pain and suffering" during the mother's pregnancy and her "mental anguish" resulting from the knowledge that she is fertile and has conceived a child, we believe the court of appeals has drawn the line in a sensible place: Damages for physical and emotional pain and suffering associated with pregnancy and birth are recoverable, but damages for emotional or psychological pain and suffering resulting from the presence of an additional family member are not.

We affirm the decision of the court of appeals and reverse the judgment of the district court, remanding the cause to that court for further proceedings consistent with this opinion (including the appendix hereto).

IT IS SO ORDERED.

SOSA, C.J., concurs.

RANSOM, J., specially concurs.

RANSOM, Justice (specially concurring).

I fully concur with the opinion we announce today, except that I cannot join in the author's express disapproval of Judge Alarid's application of *Clark v. Cassetty*. When Judge Alarid said "the term 'injury' in tort law refers to the wrongful act or tort itself" he expressly included within that injury "the doctor's act in only ligating one fallopian tube and then failing to in-

form Maria Mendez that she was still fertile." The unligated tube and the misinformation are to this case what the fire was to *Clark*. Judge Alarid and Justice Montgomery each have used good rationale to explain their conclusions. In this case, Mrs. Mendez was injured the moment the doctor breached his duty to exercise requisite care and left her with an unligated tube in the sterilization operation, and she was further injured when he failed to inform her of the unsuccessful outcome. Except for harm that we may deem too remote as a matter of public policy, Mrs. Mendez is entitled to recover damages for all harm proximately caused by the injury. I agree impairment of financial security is not too remote a "harm." It is an interest to which we should give legal protection.

APPENDIX

OPINION

ALARID, Judge.

This is a medical malpractice action. Plaintiffs, Jacob and Maria Mendez, appeal from the order of the trial court granting defendant, Lovelace Medical Center, partial summary judgment with respect to all claims for the cost of raising their third child, Joseph Mendez, to the age of majority. Defendant contends, and we agree, that this is purely an issue of law, which is a proper basis for summary judgment. *See General Elec. Credit Corp. v. Tidenberg*, 78 N.M. 59, 428 P.2d 33 (1967). Defendant has not conceded liability, but because the motion for partial summary judgment was directed only to the issue of damages, we view plaintiffs' factual allegations as true. Thus, for purposes of review, we assume, as the trial court did, that plaintiffs will be able to prove liability as well as other facts offered in opposition to partial summary judgment. We reverse the partial summary judgment and remand this case to the trial court for further proceedings consistent with this opinion.

**9.** This case does not present, and we express no opinion on, the question whether damages for

emotional distress might be recoverable if the baby were born with one or more birth defects.

## FACTS

Maria and Jacob Mendez, a married couple, decided that they wanted to limit the size of their family. From the record in this case, it appears that this decision was based on their belief that they could not afford to raise more than two children. Accordingly, after the birth of the couple's second child, Maria underwent a tubal ligation performed by a doctor employed by defendant. The doctor found and ligated only one of Maria's two fallopian tubes, which meant that Maria was still able to conceive a child. According to the allegations of the complaint, defendant's employee negligently failed to inform Maria that only one of her tubes had been found and ligated, that despite the surgery she was still able to conceive a child, and that she should therefore continue to use birth control measures. The not surprising result of this alleged negligence was that Maria conceived a third child, Joseph, within months of the surgery.

After Joseph was born, plaintiffs filed this malpractice action. Defendant moved for partial dismissal or partial summary judgment, contending that, as a matter of law, plaintiffs were not entitled to recover as damages the costs of raising Joseph from his birth through the age of majority. The factual basis for this motion is undisputed. Defendant submitted an affidavit in support of its motion showing that Joseph's health is "within normal limits." Plaintiffs submitted the affidavit of Dr. Everett Dillman, an economist, who estimated that, based on information from the United States Department of Agriculture, the costs of raising Joseph to age eighteen, based on a moderate level of support, will be $93,164. Dr. Dillman estimated an additional $28,228 for required care for Joseph based on federal minimum wage using ten hours a week to age eighteen. In addition, Jacob and Maria both submitted affidavits restating the substance of the allegations in the complaint and detailing the financial problems that developed as the result of the unexpected pregnancy.

The trial court granted defendant's motion, holding that it was "difficult for this Court to recognize the birth of a child as a compensable legal harm, even though the rearing of the child will lead to unexpected expense." Accordingly, the trial court held that damages in the action should be limited to the costs of the pregnancy and delivery, the second tubal ligation, and any pain and suffering found by the jury. The trial court certified the issue for interlocutory appeal. This court granted the interlocutory appeal. We now reverse the partial summary judgment.

## I. APPELLATE JURISDICTION OVER THIS APPEAL

[OMITTED]

## II. DAMAGES RECOVERABLE FOR MEDICAL MALPRACTICE

The legal issue before this court is whether plaintiffs in this medical malpractice action are entitled to seek, as part of their compensatory damages, an amount representing the present value of the reasonable out-of-pocket expenses they will incur in raising Joseph to the age of majority, referred to hereafter as the expenses of raising the child or child-rearing expenses. Defendant argues plaintiffs are seeking to create a new cause of action, an action for "wrongful birth." From a review of the cases and literature on this subject, we believe it has mischaracterized this suit. Generally, courts and commentators have characterized actions by the parents of a child who is not normal and healthy, for the expenses of raising the child, as "wrongful birth" actions. A case such as this, in which the parents of a normal, healthy child sue on their own behalf for those damages, has been more properly characterized as a "wrongful conception" or "wrongful pregnancy" action. *See, e.g., Johnston v. Elkins,* 241 Kan. 407, 736 P.2d 935 (1987); *Morris v. Sanchez,* 746 P.2d 184 (Okla.1987); *Smith v. Gore,* 728 S.W.2d 738 (Tenn.1987). These actions are contrasted with actions for "wrongful life," in which the child, who is not normal and healthy, sues on his own behalf for having

been born with defects due to a physician's negligence. *See id.*

We recognize that courts and commentators have found these labels useful. However, we view plaintiffs' claims as an ordinary claim for negligence or medical malpractice, and the damages at issue here as damages that plaintiffs are entitled to claim under ordinary principles of tort law as applied in this state. We reject defendant's implicit argument that there should be something different about the damages at stake here because the money, if any, ultimately awarded by the jury will be used to pay expenses incurred in raising Joseph, rather than just those expenses usually associated with malpractice, such as the expenses associated with the second tubal ligation.

The elements of a cause of action for medical malpractice are well established in this state. In New Mexico, a doctor is required to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified doctors in the same field of medicine practicing under similar circumstances. SCRA 1986, 13–1101. This duty includes a duty to provide the patient with certain information. *See* SCRA 1986, 13–1104A. A doctor who breaches this duty is liable for the harm that results to the patient if a reasonably prudent person would have acted upon the information to avoid the harm. SCRA 1986, 13–1116B. When a plaintiff has proved a case under these principles, the plaintiff is entitled to recover, as part of the compensatory damages, "[t]he reasonable value of necessary nonmedical expenses which have been required as a result of the injury [and the present cash value of such nonmedical expenses reasonably certain to be required in the future]." SCRA 1986, 13–1805 (brackets in original).

In New Mexico, as elsewhere, the purpose of compensatory damages is to make an injured person whole. *Hood v. Fulkerson,* 102 N.M. 677, 680, 699 P.2d 608, 611 (1985); *Fredenburgh v. Allied Van Lines, Inc.,* 79 N.M. 593, 596, 446 P.2d 868, 871 (1968) ("The measure of damages should be that which fully and fairly compensates for the injuries received."); *Topmiller v. Cain,* 99 N.M. 311, 314, 657 P.2d 638, 641 (Ct. App.1983); *see also Abbinett v. Fox,* 103 N.M. 80, 86, 703 P.2d 177, 183 (Ct.App. 1985); 4 *Restatement (Second) of Torts* § 901, 917 (1979). Indeed, one of the functions of compensatory damages is to indemnify the injured party against financial losses proximately caused by the negligence of another. *Id.,* §§ 901, 903. The primary issue is whether the damages are a reasonably foreseeable result of the negligence of the defendant. *Cf. Topmiller v. Cain;* 4 *Restatement (Second) of Torts* § 917.

Defendant does not challenge these long-established principles of tort law. Instead, defendant argues that this court should, for public policy reasons, carve out an exception to the general policies of tort law, and rule that plaintiffs cannot recover the expenses of raising the child. We decline to do so. This court is bound by precedents of the supreme court. *Alexander v. Delgado,* 84 N.M. 717, 507 P.2d 778 (1973). We believe that under current New Mexico law, including uniform jury instructions approved by the supreme court, plaintiffs are entitled to recover for the costs of raising Joseph. Moreover, even if we did not believe this matter is clear under current law, we would still hold plaintiffs are entitled to recover these damages. Tort law has traditionally been concerned with the allocation of the financial consequences of a defendant's negligence. *See e.g., Wilschinsky v. Medina,* 108 N.M. 511, 516, 775 P.2d 713, 718 (1989) ("We do not live in a risk-free society, but rather a risk-allocative one."); *cf.* 4 *Restatement (Second) of Torts* §§ 901, 903; W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 1 (5th ed. 1984). We see no reason to relieve defendant of the responsibility imposed by ordinary principles of tort law, which require defendant to indemnify plaintiffs against the financial consequences that are the proximate result of defendant's negligence.

We are well aware that other jurisdictions have decided this issue differently.[1] We are concerned that the number of these cases gives a false impression of unanimity. Many of these decisions include strong dissents from one or more judges, criticizing the rationale of the majority and urging the adoption of a different rule.[2] A

LOUISIANA has not directly addressed the "wrongful conception" issue; however, in a "wrongful birth" case, the court refused to award child-rearing damages, and intimated the result would be the same if the child were

**1.** Thirty-eight jurisdictions have addressed this issue. Twenty-nine jurisdictions deny child-rearing damages in "wrongful conception" cases: ALABAMA, *Boone v. Mullendore,* 416 So.2d 718 (Ala.1982); ARKANSAS, *Wilbur v. Kerr,* 275 Ark. 239, 628 S.W.2d 568 (1982); DELAWARE, *Coleman v. Garrison,* 349 A.2d 8 (Del. 1975); DISTRICT OF COLUMBIA, *Flowers v. District of Columbia,* 478 A.2d 1073 (D.C.App. 1984); FLORIDA, *Public Health Trust v. Brown,* 388 So.2d 1084 (Fla.Dist.Ct.App.1980); GEORGIA, *Fulton–DeKalb Hosp. Auth. v. Graves,* 252 Ga. 441, 314 S.E.2d 653 (1984); ILLINOIS, *Cockrum v. Baumgartner,* 95 Ill.2d 193, 69 Ill.Dec. 168, 447 N.E.2d 385, *cert. denied sub nom. Raja v. Michael Reese Hosp.,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); INDIANA, *Garrison v. Foy,* 486 N.E.2d 5 (Ind.Ct.App.1985); IOWA, *Nanke v. Napier,* 346 N.W.2d 520 (Iowa 1984); KANSAS, *Byrd v. Wesley Medical Center,* 237 Kan. 215, 699 P.2d 459 (1985); KENTUCKY, *Schork v. Huber,* 648 S.W.2d 861 (Ky.1983); MAINE, *Macomber v. Dillman,* 505 A.2d 810 (Me.1986); MICHIGAN, *Rinard v. Biczak,* 177 Mich.App. 287, 441 N.W.2d 441 (1989); MISSOURI, *Miller v. Duhart,* 637 S.W.2d 183 (Mo.Ct. App.1982); NEW HAMPSHIRE, *Kingsbury v. Smith,* 122 N.H. 237, 442 A.2d 1003 (1982) (court referred to case as "wrongful birth" case, but child was healthy); NEW JERSEY, *P. v. Portadin,* 179 N.J.Super. 465, 432 A.2d 556 (1981); NEW YORK, *O'Toole v. Greenberg,* 64 N.Y.2d 427, 477 N.E.2d 445, 488 N.Y.S.2d 143 (1985); NORTH CAROLINA, *Jackson v. Bumgardner,* 318 N.C. 172, 347 S.E.2d 743 (1986); OHIO, *Johnson v. University Hosps. of Cleveland,* 44 Ohio St.3d 49, 540 N.E.2d 1370 (1989); OKLAHOMA, *Morris v. Sanchez,* 746 P.2d 184 (Okla.1987); PENNSYLVANIA, *Mason v. Western Pa. Hosp.,* 499 Pa. 484, 453 A.2d 974 (1982); TENNESSEE, *Smith v. Gore,* 728 S.W.2d 738 (Tenn.1987); TEXAS, *Terrell v. Garcia,* 496 S.W.2d 124 (Tex.Civ.App.1973), *cert. denied,* 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974); UTAH, *C.S. v. Nielson,* 767 P.2d 504 (Utah 1988); VIRGINIA, *Miller v. Johnson,* 231 Va. 177, 343 S.E.2d 301 (1986); WASHINGTON, *McKernan v. Aasheim,* 102 Wash.2d 411, 687 P.2d 850 (1984) (En Banc); WEST VIRGINIA, *James G. v. Caserta,* 332 S.E.2d 872 (W.Va.1985); WISCONSIN, *Rieck v. Medical Protective Co. of Fort Wayne, Ind.,* 64 Wis.2d 514, 219 N.W.2d 242 (1974); WYOMING, *Beardsley v. Wierdsma,* 650 P.2d 288 (Wyo.1982) (court spoke in terms of "wrongful life" or "wrongful birth," but child in case was healthy).

healthy. *Pitre v. Opelousas Gen. Hosp.,* 530 So.2d 1151 (La.1988).

NEVADA apparently denies any recovery in "wrongful conception" actions grounded in tort, even medical expenses surrounding the birth of the child, but has not foreclosed the possibility of damages for actions grounded in contract. *Szekeres v. Robinson,* 102 Nev. 93, 715 P.2d 1076 (1986).

Several jurisdictions do allow some recovery for child-rearing expenses, but, under the "offsetting benefits" rule, allow the jury to deduct from that award the intangible benefits the parents receive from parenthood. ARIZONA, *University of Ariz. Health Sciences Center v. Superior Court,* 136 Ariz. 579, 667 P.2d 1294 (1983) (En Banc); CALIFORNIA, *Stills v. Gratton,* 55 Cal. App.3d 698, 127 Cal.Rptr. 652 (1976); CONNECTICUT, *Ochs v. Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982); MARYLAND, *Jones v. Malinowski,* 299 Md. 257, 473 A.2d 429 (1984); MINNESOTA, *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn.1977). (A subsequent Minnesota case noted that *Sherlock* "may, perhaps, have been erroneous," given a later statute prohibiting wrongful life and wrongful birth causes of action. *Hickman v. Group Health Plan, Inc.,* 396 N.W.2d 10, 14 n. 5 (Minn.1986).)

**2.** *See, e.g., Flowers v. District of Columbia,* 478 A.2d 1073 (D.C.App.1984) (majority holds plaintiffs cannot recover the expenses of raising the child; Ferren, J., dissenting, would adopt offsetting the benefits rule); *Public Health Trust v. Brown,* 388 So.2d 1084 (Fla.Dist.Ct.App.1980) (majority holds no recovery for expenses of raising the child; Pearson, J., dissenting, would adopt offsetting the benefits rule); *Fulton–DeKalb Hosp. Auth. v. Graves,* 252 Ga. 441, 314 S.E.2d 653 (1984) (majority holds no recovery for expenses of raising the child; Gregory and Smith, JJ., dissenting, would allow recovery of the expenses of raising the child, apparently without offset); *Cockrum v. Baumgartner,* 95 Ill.2d 193, 69 Ill.Dec. 168, 447 N.E.2d 385, *cert. denied sub nom. Raja v. Michael Reese Hosp.,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983) (majority holds no recovery for expenses of raising the child; Clark and Simon, JJ., dissenting, would adopt offsetting the benefits rule); *Nanke v. Napier,* 346 N.W.2d 520 (Iowa 1984) (majority holds no recovery for expenses of raising the child; Wolle, J., dissenting, would adopt offsetting the benefits rule); *Schork v. Huber,* 648 S.W.2d 861 (Ky.1983) (majority holds no recovery for expenses of raising the child; Leibson, J., dissenting, would allow recovery of the expense of raising the child; Vance, J., dissenting, would adopt offsetting the benefits rule); *Macomber v. Dillman,* 505 A.2d

number of commentators have been equally critical of the majority rule that these damages should not be allowed.[3] Even the courts that have reached the same result have been unable to agree on a single rationale. Some courts have based their decision on the rationale that the damages are speculative or would permit imposition of liability disproportionate to the defendant's culpability. *See, e.g., Coleman v. Garrison,* 349 A.2d 8 (Del.1975); *Miller v. Johnson,* 231 Va. 177, 343 S.E.2d 301 (1986); *Beardsley v. Wierdsma,* 650 P.2d 288 (Wyo.1982). Other courts have expressed concern that allowing the recovery of such damages would inflict a traumatic injury on the child. *See, e.g., Boone v. Mullendore,* 416 So.2d 718 (Ala.1982). Still other courts have grounded their decisions on their perceptions of public policy as expressed in the laws of the state concerning families. *See, e.g., Flowers v. District of Columbia,* 478 A.2d 1073 (D.C.App.1984); *Smith v. Gore,* 728 S.W.2d 738 (Tenn.1987).

The rationale most commonly adopted by the courts, and relied upon by the dissent and the trial court in this case, is that parents cannot, as a matter of law, be injured by the birth of a normal, healthy child. We disagree with the position adopted by other courts and adopted in the dissent because we do not think it is either a sound legal analysis or a sound policy analysis.

Properly used, the term "injury" in tort law refers to the wrongful act or tort itself. *Clark v. Cassetty,* 71 N.M. 89, 376

P.2d 37 (1962). Similarly, the term "damage" is usually used to denote the financial consequences of the injury, which are ordinarily recoverable in tort. *Cf. id.* In this case, the injury is the doctor's act in only ligating one fallopian tube and then failing to inform Maria Mendez that she was still fertile and should continue using some means of birth control. We do not, and need not, reach the issue of whether the measure of damages allowed here would be the same as those allowed in a case where the patient had been fully informed of the result and properly advised of the consequences. If plaintiffs can prove the allegations in the complaint, then plaintiffs have been injured. The vast majority of jurisdictions recognize this injury as one for which plaintiffs should receive some compensation. The critical issue on which the courts have diverged is the question of whether the compensation should include indemnification against the expenses of raising the child conceived as a result of the doctor's negligence.

We believe that requiring defendant to indemnify plaintiffs against the expense of raising the child is the more sound policy. Recovery of money damages in tort actions is grounded on policy reasons. As noted above, damages in tort actions are designed to put plaintiffs as nearly as possible in the position they would have been absent defendant's negligence, and to indemnify plaintiffs against financial expenses or losses that are the result of a defendant's negligence. 4 *Restatement (Second) of Torts* § 901. To a lesser ex-

---

810 (Me.1986) (majority holds no recovery for expenses of raising the child; Scolnik, J., dissenting, would adopt offsetting the benefits rule); *Morris v. Sanchez,* 746 P.2d 184 (Okla. 1987) (majority holds no recovery for expenses of raising the child; Opala and Kauger, JJ., dissenting, would adopt offsetting the benefits rule).

**3.** *See* Comment, *Wrongful Pregnancy: Child Rearing Damages Deserve Full Judicial Consideration,* 8 Pace L.Rev. 313 (1988) (arguing for recovery of the expense of raising the child); Cheslik, *Wrongful Conception,* 35 Fed'n Ins. Couns. Q. 289 (Spring 1985); Comment, *Judicial Limitations on Damages Recoverable for the Wrongful Birth of a Healthy Infant,* 68 Va.L.Rev.

1311 (1982) (arguing in favor of recovery of the expense of raising the child); Comment, *One More Mouth to Feed: A Look at Physicians' Liability for the Negligent Performance of Sterilization Operations,* 25 Ariz.L.Rev. 1069 (Fall 1983) (arguing in favor of the offsetting the benefits rule); Kashi, *The Case of the Unwanted Blessing: Wrongful Life,* 31 U.Miami L.Rev. 1409 (1977) (arguing in favor of recovery of the expense of raising the child); Robertson, *Civil Liability Arising from "Wrongful Birth" Following an Unsuccessful Sterilization Operation,* 4 Am.J.L. & Med. 131 (1978) (arguing in favor of recovery of expense of raising the child); Note, *Wrongful Conception: Who Pays for Bringing Up Baby?,* 47 Fordham L.Rev. 418 (1978) (arguing in favor of the offsetting the benefits rule).

tent, money damages are also designed to deter negligence, by insuring that a negligent act has consequences for the actor. Recovery of the expenses of raising a child serves both these purposes.

A number of courts have held that the birth of a child does not constitute a harm to the parents. These decisions do not always discuss the underlying basis for the holding. There appear to be several notions encompassed in this policy judgment. First, at least one commentator has suggested that this view is rooted in a time when society was largely agricultural, and children were actively involved in those activities, thereby generating an economic benefit for their parents. *See* Cheslik, *Wrongful Conception*, 35 Fed'n Ins. Couns. Q. 289 (Spring 1985). This basis for the policy has long since vanished. In a post-industrial society, the cost of raising a child usually exceeds the economic benefit, if any, the family derives from the child. Defendant is, of course, free to attempt to prove that is not so in this case.

Second, it appears that some courts have adopted this position because they are concerned that allowing plaintiffs to recover the expenses of raising a child is inconsistent with society's acknowledgement of the sanctity of life, and the high value we place on it. *See, e.g., O'Toole v. Greenberg*, 64 N.Y.2d 427, 477 N.E.2d 445, 488 N.Y.S.2d 143 (1985).

We bow to no one in our respect for the sanctity and value of human life. Indeed, we believe our decision today promotes rather than inhibits those values. We cannot understand why the sanctity of human life justifies denying recovery of the expense of raising the child. The harsh irony of this position is apparent: two people who have already decided that they cannot afford to raise another child will be left to find a way to do so. Our philosophical respect for human life should not be allowed to obscure the fact that children need to be fed, clothed, housed, educated, and provided with medical care and other necessities. A growing number of people in this country decide whether or not to become parents, or how many children to have, based in part on their financial resources. *See Rinard v. Biczak*, 177 Mich. App. 287, 441 N.W.2d 441 (1989). We do not understand why a proper respect for human life would require us to reach a result that is, at best, callously indifferent to the needs of these parents and their children.

In a similar vein, we note that at least two courts have justified the result urged on us by defendant on the basis of a concern for family life. *See Smith v. Gore; Flowers v. District of Columbia.* We believe our decision today will strengthen rather than weaken family life. As judges who have served on both the trial and the appellate courts of this state, we are well aware that families today are under enormous strains, and that some of these strains are financial. We are also aware that some families are literally torn apart by divorce as a result of financial burdens that they cannot shoulder. When that happens, the entire family suffers. As it happens to more and more families, society as a whole suffers. We will not, in the name of the sanctity of human life, adopt a policy that increases the financial burdens on parents who have chosen to avoid the additional expense of raising a child. To do so would only further weaken the family as an institution. We believe the policy urged on us by defendant is shortsighted at best.

Defendant has argued that if plaintiffs are allowed to seek recovery of the out-of-pocket expenses of raising Joseph, the jury should be instructed to value the intangible emotional benefits plaintiffs will receive from raising him, and subtract that amount from the compensatory award. We recognize that a number of courts have held that this is appropriate. *See* cases cited in footnote 1. Again, we believe this position is unsound from both a legal and a policy standpoint.

Defendant's argument that plaintiffs are seeking to be compensated for Joseph's birth fails to recognize the distinction between two types of compensatory damages: damages for past and future mental pain and suffering, and damages designed to

indemnify plaintiffs against past and future out-of-pocket expenses that are the proximate result of a defendant's negligence. The "offset the benefits" rule appears to be based on 4 *Restatement (Second) of Torts* § 920. However, the comments to the section make it clear that this rule should be applied only to offset similar kinds of damages. *Id.,* comments a, b. In the context of this case, that would mean that the emotional benefits of raising the child could be offset against any pain and suffering plaintiffs might claim, but not against the financial expense incurred in raising the child. The *Restatement* is not authority for the kind of offset urged on us by defendant.

More importantly, the law of New Mexico is against allowing recovery for negligent damage to the intangible emotional benefits of family life. In *Roseberry v. Starkovich,* 73 N.M. 211, 387 P.2d 321 (1963), our supreme court held that one spouse could not recover damages for loss of consortium resulting from a negligent injury to the other spouse. More recently, this court held in *Wilson v. Galt,* 100 N.M. 227, 668 P.2d 1104 (Ct.App.1983), that parents have no cause of action for loss of filial consortium. While the benefits of family life may be significant, in both cases recovery was denied in part because the benefits are intangible and too difficult to measure. In both cases, however, the parties were allowed to recover for economic consequences of the defendant's negligence. To now allow defendants to claim the intangible benefits of family life as an offset against the economic consequences of their actions would be illogical.

By the same token, we believe the offset rationale is unsound from a policy standpoint. We think most parents would agree that raising children involves both great joy and heavy burdens. The responsibility of raising a child is not one to be lightly undertaken. We share the concern of other courts that have criticized this rule as encouraging parents to denigrate their children. We do not find it palatable, in a case such as this, for the parties to indulge in arguments concerning the intangible benefits and burdens of parenthood. The intangible benefits or burdens a child provides are too speculative and would encourage the parties and the jury to engage in distasteful moral determinations.

Given the procedural posture of this case, it is difficult to determine whether plaintiffs are seeking damages for emotional or psychological pain and suffering caused by an unplanned addition to their family. However, since the issue may be raised after the case is remanded, we hold that plaintiffs may not seek compensation for emotional or psychological burdens caused by the raising of Joseph, nor may defendant present evidence of emotional and psychological benefits of parenthood. We hold that plaintiffs may recover for the expense, including lost wages, and the physical and emotional pain and suffering associated with the pregnancy and birth, the cost of a subsequent sterilization, and the cost of raising the child to the age of majority. No other psychological or emotional evidence or instructions should be allowed.

Finally, we address the question of whether a plaintiff in this type of case is required to mitigate damages by either having an abortion or placing the child for adoption. We hold such is not required.

Mitigation of damages is an affirmative defense that must be pled and proved by the defendant in a personal injury action. *Acme Cigarette Servs., Inc. v. Gallegos,* 91 N.M. 577, 577 P.2d 885 (Ct.App.1978). The law in this state is that a person injured by the tort of another is required to use ordinary care to minimize or lessen the injuries sustained. SCRA 1986, 13–1811; *Rutledge v. Johnson,* 81 N.M. 217, 465 P.2d 274 (1970). This principle has been applied most frequently in cases in which a plaintiff failed to recover fully from his injuries due to his failure to follow his doctor's instructions. *See, e.g., Martinez ex rel. Martinez v. Vigil,* 105 N.M. 741, 737 P.2d 100 (Ct.App.1987). We note, however, that all that is required is that the injured party undertake ordinary or reasonable measures to mitigate damages. *See Mitchell v.*

**354**

*Jones,* 47 N.M. 169, 138 P.2d 522 (1943); *Selgado v. Commercial Warehouse Co.,* 88 N.M. 579, 544 P.2d 719 (Ct.App.1975); *see also* SCRA 1986, 13–1811. We agree with other courts that have considered this issue, and hold that, as a matter of law, neither abortion nor adoption is an ordinary or a reasonable measure as that phrase is used in the law relating to mitigation of damages. *See, e.g., University of Ariz. Health Sciences Center v. Superior Court,* 136 Ariz. 579, 667 P.2d 1294 (1983) (En Banc); *Jones v. Malinowski,* 299 Md. 257, 473 A.2d 429 (1984); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn.1977). We recognize that both of these alternatives are available to and chosen by a certain number of families every year. However, we do not believe either course of action may properly be required in order to mitigate the financial consequences of the doctor's negligence. The trial court shall not allow argument on this issue, nor instruct the jury concerning the requirement of mitigation unless another factual basis for the instruction is established by the evidence at trial.

The trial court's order granting defendant partial summary judgment on this issue is vacated. This case is remanded to the trial court for further proceedings consistent with this opinion.

IT IS SO ORDERED.

/s/ A. JOSEPH ALARID, Judge

I CONCUR:

/s/ BENJAMIN ANTHONY CHAVEZ, Judge

WILLIAM W. BIVINS, Chief Judge, concurring in part, dissenting in part