775 P.2d 713

**Tui WILSCHINSKY, Irene Rokstad Wilschinsky, in their own behalf and as parents and next friends of Zoe Wilschinsky, Taflyn Wilschinsky, and Tara Rokstad, Plaintiffs,**

**v.**

**Helen MEDINA and Michael Straight, M.D., Defendants.**

**No. 17658.**

Supreme Court of New Mexico.

June 29, 1989.

**512**

Stephen Durkovich, Albuquerque, for plaintiffs.

Rodey, Dickason, Sloan, Akin & Robb, P.A. and W. Mark Mowery, Santa Fe, for defendant, Medina.

Campbell & Black, P.A., John H. Bemis and Bradford C. Berge, Santa Fe, for defendant, Straight.

Hatch, Beitler, Allen & Shepherd, P.A. and Phyllis A. Dow, Albuquerque, amicus curiae, New Mexico Medical Soc.

## OPINION

BACA, Justice.

This certification from the United States District Court raises a fundamental question whether a third party, who is injured by a person under the influence of medications administered to her as an outpatient in a doctor's office, can recover directly from the doctor when and if the doctor failed to follow proper medical procedures, and when and if it can be proven the third party suffered injuries which proximately resulted from that doctor's act of malpractice. The district court certified the following three questions to this court:

1. Does the legal duty of a physician practicing in New Mexico to use reasonable care in treating a patient extend only to the patient or also to others who may foreseeably be harmed by the physician's negligent treatment of the patient?

2. If the legal duty extends to others in addition to the patient, what is the nature and extent of the duty owed to the plaintiffs in this case?

3. If the legal duty extends to others in addition to the patient, does the New Mexico Medical Malpractice Act ... [NMSA 1978, §§ 41–5–1 to 41–5–28 (Repl.Pamp.1986)] apply to claims based on malpractice asserted by non-patients against a physician who is qualified under the provisions of the Medical Malpractice Act?

The issues certified arose under the following circumstances. Plaintiffs Tui Wilschinsky and members of his family filed suit in the United States District Court against Helen Medina, alleging Medina was the driver of a car that struck and injured Wilschinsky in the presence of his family. Plaintiffs then filed an amended complaint seeking to join Dr. Michael Straight as an additional defendant, alleging Dr. Straight was negligent in administering to Medina two drugs that have known side effects causing drowsiness and impairment of judgment. Dr. Straight moved to dismiss.

The facts, as developed by depositions of the parties, indicate on the morning of the accident Medina was suffering from a debilitating migraine headache. She had taken the drug Percodan at about 8:00 a.m. Dr. Straight had previously prescribed this drug for Medina's headache problems, which Dr. Straight had been treating since October 1983. On the morning of August 7, 1985, Medina went to Dr. Straight's office and complained the Percodan was not helping. Dr. Straight administered by injection a drug named Meperidine, which is composed of equal parts of Phenergan and Demerol. When Medina complained of nausea, Dr. Straight administered a second drug, either Vistaril or Tigan, to combat Medina's nausea. It is unclear exactly how long Medina remained in the office, and exactly how much time elapsed between the administration of these drugs and her accident. According to Dr. Straight, roughly seventy minutes may have passed between the first injection and Medina's accident. Again according to Dr. Straight, the drug Meperidine would have peaked in Medina's system between thirty and fifty minutes after the injection. Meperidine's effects may have been enhanced by both prior and subsequent drugs.

The above facts taken together show that Dr. Straight administered drugs in his office to Medina, which drugs could cloud a person's judgment and physical abilities and create a risk to that person in driving a car; that Medina was involved in a serious car accident within a short time of receiving medication; and that Wilschinsky suffered injuries from that accident. Based on these facts, we granted certification because whether a doctor may owe a duty to

a third person such as Wilschinsky involves an important interpretation of New Mexico law, and our answer to that question would materially advance the federal litigation by resolving whether Dr. Straight can be joined in the Wilschinskys' lawsuit.[1]

I

Whether a practicing physician in New Mexico owes a duty to third persons who foreseeably may be harmed by the physician's negligence in treatment of his patient is an issue of first impression in this state. In addressing this question generally, we focus on the patient-care setting that gave rise to this certification. The recent growth in use of outpatient clinics, day surgery units, and extensive office procedures is a new development in health care, unforeseen at the time when most state legislatures adopted malpractice legislation. It is encouraged by insurance policies that offer only partial coverage for patients admitted into hospitals over night. As more extensive medical procedures are shifted to an outpatient setting, the risk of injuries to the general public from patients driving under the influence of drugs increases.

The existence of duty is a question of law. *Schear v. Board of County Comm'rs*, 101 N.M. 671, 687 P.2d 728 (1984). In analyzing whether a duty exists we note the following language from Prosser:

> Changing social conditions lead constantly to the recognition of new duties. No better general statement can be made, than that the courts will find a duty where, in general, reasonable men would recognize it and agree that it exists.

W. Page Keeton, *Prosser & Keeton on the Law of Torts*, § 53, at 359 (5th ed. 1984) (footnote omitted).

The finding of a duty involves the court in a careful balancing. We must "take into account the likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that bur-

den upon the defendant." *Kirk v. Michael Reese Hosp. & Medical Center*, 117 Ill.2d 507, 526, 111 Ill.Dec. 944, 953, 513 N.E.2d 387, 396 (1987). At the outset we note the salient alleged facts: testimony was offered to show the drugs administered included at least one narcotic; this narcotic's effect may have been enhanced by two additional drugs in Medina's blood stream; the effect of the narcotic would have peaked near the time of the accident; and the drugs have side effects that could impair a person's ability to make rational judgments and impair a person's ability to drive an automobile.

Heretofore, courts have recognized two sources of duty for the medical profession to third parties: when a doctor exerts control over a patient, or when a doctor is aware of threats against specific, identifiable third parties. In the control cases, courts have relied upon Section 315 of the Restatement (Second) of Torts to find a special relationship between doctor and patient, which creates a special duty to control that patient's actions. Restatement (Second) of Torts § 315 (1965). This doctrine, holding institutions and doctors potentially liable for patients with known "dangerous propensities" has been recognized in New Mexico. *See Kelly v. Board of Trustees*, 87 N.M. 112, 529 P.2d 1233 (Ct.App.), *cert. denied*, 87 N.M. 111, 529 P.2d 1232 (1974); *see also Stake v. Woman's Div. of Christian Serv.*, 73 N.M. 303, 387 P.2d 871 (1963). We do not find the facts here to raise an issue of patient control. Liability under these facts must stem from the doctor's control over his offices and the administration of powerful drugs in those offices, not from a duty to control a patient with known dangerous propensities.

A second, though not mutually exclusive, line of cases has followed from *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976). In *Tarasoff*, a psychiatrist, aware of specific threats to the life of an individu-

---

1. We note that while certification was granted in this case prior to this court's per curiam opinion in *Schlieter v. Carlos*, 108 N.M. 507, 775 P.2d 709 (1989), we could have granted certification in this case by applying the standards articulated in *Schlieter*.

al, abided by professional ethics in failing to disclose his patient's threats to authorities or to the person threatened. The court found the doctor breached a duty to warn when a specific, identifiable third party was known to the doctor. Again, this duty to warn specific, identifiable third parties is *not* an issue raised by the facts of this certification. The only issue raised by these facts is whether a doctor owes a duty to third parties from treatment of an outpatient when the doctor has given the patient an injection of drugs that could clearly impair the patient's ability to reason and to operate an automobile.

Cases from other jurisdictions have addressed similar, though not precisely equivalent facts. In *Gooden v. Tips*, 651 S.W.2d 364 (Tex.Ct.App.1983), the Texas Court of Appeals concluded that a doctor, who had prescribed quaaludes to a patient with a known propensity to abuse drugs, might be liable to a third party injured in an automobile accident. The *Gooden* court specifically found no duty "to *control* the actions of the patient," but only a duty to warn the patient. *Gooden*, 651 S.W.2d at 371. The *Gooden* court relied upon authority from several jurisdictions. *See Wharton Transp. Corp. v. Bridges*, 606 S.W.2d 521 (Tenn.1980) (cause of action for indemnity by trucking company for doctor's negligent failure to perform an adequate physical upon company's driver); *Freese v. Lemmon*, 210 N.W.2d 576 (Iowa 1973) (cause of action by injured pedestrian against doctor for failing to diagnose patient's epileptic condition); *Kaiser v. Suburban Transp. Sys.*, 65 Wash.2d 461, 398 P.2d 14 (1965) (cause of action for failing to warn patient of dangerous side effects of drug prescribed to bus driver).

Both *Gooden* and *Kaiser* created third-party liability when a doctor apparently had negligently prescribed a potentially dangerous drug. The Illinois Supreme Court, however, recently declined to find third-party liability for the allegedly negligent prescription of drugs to a psychiatric patient whose accident on the morning of his release injured a passenger. *Kirk*, 117 Ill.2d at 53, 111 Ill.Dec. at 956, 513 N.E.2d at 399. That case may be distinguishable

from an evolving policy to create a duty in that the driver-patient had consumed an alcoholic beverage after his release and prior to the accident. In any case, we note the facts before us do *not* involve prescription and we specifically decline to address the issue of whether under any facts, negligently prescribing drugs could give rise to third-party liability. This case raises the third-party liability issue in the context of injections given in a doctor's office and we turn, therefore, to those few cases which have discussed injuries involving patients who have been treated or injected in the doctor's care.

In *Joy v. Eastern Maine Medical Center*, 529 A.2d 1364 (Me.1987), the Supreme Court of Maine allowed a third-party cause of action against a doctor whose treatment included fitting his patient with an eyepatch. The court wrote "when a doctor knows, or reasonably should know that his patient's ability to drive has been affected, he has a duty to the driving public." *Id.* at 1366. In *Welke v. Kuzilla*, 144 Mich.App. 245, 375 N.W.2d 403 (1985), the Michigan Court of Appeals found that an injection given on the evening prior to the accident created a cause of action in malpractice for the third-party victim. The facts in these two cases are markedly different from the present case.

The facts of this certification present a stronger argument for finding a duty than any of the cases described above. Unlike *Joy*, facts here do not suggest that Medina should have known the extent of her risk in accepting medication. In *Joy*, the doctor argued the eyepatch created an obvious impairment for which no reasonable person required a warning. Here, one side effect of the drugs may have been impairment of the patient's ability to reason. In addition, it will require medical testimony to explain the probable diminishment of capacity when Demerol is administered, either by itself, or in combination with other drugs. Unlike *Welke*, facts here also suggest a stronger argument for proximate cause, as Dr. Straight injected Medina within seventy minutes of the accident. Finally, unlike the prescription

cases, the administration of these drugs was within the doctor's presence, in the doctor's office under his direction and timing, making reasonable preventative measures of whatever type easier to implement, and, at the same time, creating a higher degree of patient reliance on the doctor's professional judgment.

Having canvassed other jurisdictions, we return to the balance set forth from the *Kirk* opinion: the likelihood of injury, the reasonableness of the burden of guarding against it, and the consequences of burdening the defendant. The likelihood of a vehicular accident immediately following injection of a narcotic in combination with other drugs is high. When the narcotic is administered by a doctor in his office, the burden of guarding against that foreseeable danger is not unreasonable if the doctor is judged by standards of normal medical procedures, rather than subjected to after-the-fact speculative attack. Finally, if the scope of the doctor's duty is limited to the professional standards of acceptable medical practice, the additional burden on the doctor's treatment decisions is negligible.

The dissent reaches a different conclusion concerning the burdens placed on doctors by this opinion. The dissent expresses concern about the burdens already placed on a doctor's practice by threat of litigation from patients. We are not, however, addressing the larger issues of malpractice in this opinion, and by recognizing a duty based on standards for malpractice we are attempting to balance fairness to the innocent injured person with fairness to the doctor's treatment decisions. The dissent also claims lawyers are not subject to liability to third parties and are treated differently. The comparison to lawyers is not apt. *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 750 P.2d 118 (1988), cited by the dissent, involved a litigant's attempt to sue his adversary's attorney for that attorney's alleged bad acts during a trial. This court specifically weighed the harm suffered by the litigant against the policy of holding lawyers to a single standard of behavior. Lawyers are bound to zealously represent their clients, with ethical codes and rules to define the limits of that representation, and disciplinary proceedings to punish lawyers' excesses. To have held lawyers liable to the party opposing the lawyers' clients would have been to imply representation in direct conflict with the representation actually undertaken. The dissent's analogy to *Garcia* might have been apt for a situation more like *Tarasoff*, when the court imposed on psychiatrists a duty to warn third parties despite their professional code of client confidentiality. Here, however, we have defined the doctor's duty in terms of medical standards already in place. Finally, contrary to the dissent's characterization of *Garcia*, that opinion recognized third-party causes of action against lawyers when lawyers were engaged in will drafting and examination of titles. The case, therefore, cannot be cited for the overbroad interpretation that this court rejected all third-party causes of action against lawyers.

The additional burden placed on doctors by this opinion is negligible because the duty we recognize is consistent with professional standards in the medical community and the liability falls under the rubric of the Medical Malpractice Act (see below). Applying the *Kirk* balance, therefore, we find Dr. Straight owed a duty to the driving public when he administered these drugs to Helen Medina under these particular circumstances.

## II

■ Having recognized a duty under these facts, we next address the scope of that duty. First, we re-emphasize the narrow factual scope of the duty recognized. The duty is not to the entire public for any injuries suffered for which an argument of causation can be made. The duty specifically extends to persons injured by patients driving automobiles from a doctor's office when the patient has just been injected with drugs known to affect judgment and driving ability. No other facts are before us, and this case may not be construed to create a general duty to the public.

■ Second, we note factual issues that preclude our finding as a matter of law the

duty would be adequately discharged by a warning. The parties contest whether Dr. Straight did warn his patient, but even if he did the adequacy of a warning is a fact issue when evidence suggests the drugs may have affected the patient's ability to comprehend the warning. It is claimed the physician should have explained that the patient would have to remain under observation until fit to drive, or that no injection would be given until transportation was available, or that other similar measures should have been taken to safeguard the patient. The timing and adequacy of any warnings, if given, are fact questions for the jury to decide in order to determine the proportionate fault, if any, of the physician.

In determining what measures might have been taken, we find the standard for argument to the jury should be that which the medical community has determined. We cannot intrude on the medical profession's own careful balancing of treatment and risk. We endorse, therefore, those policies which already exist for the administration of powerful drugs in outpatient settings. Medical standards for the administration of drugs must define the duty owed by Dr. Straight, both as to his patient, and to the Wilschinskys. We do not live in a risk-free society, but rather a risk-allocative one. Where doctors are bound to administer to the sick and take an oath to that effect, they should not be asked to weigh notions of liability in their already complex universe of patient care. If, on the other hand, a doctor fails to meet the standards of his own community in caring for his patient, his liability is defined by the Medical Malpractice Act, with limits set regardless of the injuries suffered or the parties affected.

## III

■ The final question certified to this court is whether the Medical Malpractice Act applies to this action. No language in the Act specifically addresses the issue of third-party recovery for an act of malpractice. In reviewing the Act, we construe all of its provisions together in order to determine the intent of the legislature on this issue. *Quintana v. New Mexico Dep't of Corrections*, 100 N.M. 224, 668 P.2d 1101 (1983), *rev'd on other grounds sub nom. Devine v. New Mexico Dep't of Corrections*, 866 F.2d 339 (10th Cir.1989).

The New Mexico Medical Malpractice Act was enacted by the legislature in order to meet an insurance crisis, to promote health care in New Mexico by providing a framework for tort liability with which the insurance industry could operate. *See* NMSA 1978, § 41–5–2 (Repl.Pamp.1986); *see also Medical Malpractice Legislation in New Mexico*, 7 N.M.L.Rev. 5 (1976–77). Through several procedural measures and by establishing a limitation on full recovery for malpractice injury, the Act restricted and limited plaintiffs' rights under the common law. The established principle of strict statutory construction for acts passed in derogation of the common law would apply. 3 N. Singer, *Sutherland Statutory Construction*, § 61.01 (4th ed. 1985).

While the legislature did not directly address potential recovery by third parties, one provision of the Act might be read to exclude third-party actions from the Act's ambit. Under paragraph C of the definitional section, 41–5–3, the legislature wrote: " '[M]alpractice claim' includes any cause of action arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient[.]" Read to this point, the legislature's definition clearly extends the Act's coverage to acts of malpractice resulting in injury *to the patient*.

After language explicating the range of allowable patient claims, the definition under Section 41–5–3(C) continues: " '[M]alpractice claim' does not include a cause of action arising out of the driving, flying or nonmedical acts involved in the operation, use or maintenance of a vehicular or aircraft ambulance[.]" By this language, the legislature created a specific exception or a negative definition for "malpractice claim."

The facts of this certification arise from a health care provider's potentially negli-

gent acts in the administration of medical treatment resulting in an injury to a third party. Thus, the activity at issue falls neither within the articulated ambit of the statutory definition, nor within the ambit of the exclusion. Under principles of narrow construction, generally we would find this cause of action is not covered by the definitional section and is therefore outside the Act. *See* 1A, N. Singer, *Sutherland Statutory Construction,* § 20.08 (4th ed. 1985) (definitions of legislature binding on the courts).

Here, however, we note several factors which should affect our analysis. First, the nonmedical nature of the articulated exclusion in paragraph C is at least some evidence the legislature foresaw and intended broad application of the concept of a "malpractice claim." Second, the specific cause of action recognized by this court did not exist in 1976. Therefore, the legislature did not intentionally fail to address this issue. Third, if we recognize a third-party cause of action for the Wilschinskys and it is not covered by the Act, a third party would be placed in a better position to achieve full recovery from an act of malpractice than would the patient malpracticed upon. Finally, the clear intent of the legislature, as articulated in Section 41–5–2, was to make malpractice insurance available to health care providers.

While courts normally are bound to follow legislative definitions, they are not bound when a definition would result in an unreasonable classification. 1A, N. Singer, *Sutherland Statutory Construction* § 20.08 (4th ed. 1985). Here, an unreasonable classification would result, as only patients with direct injuries from acts of malpractice would be denied full recovery under the Act. The Supreme Court of Arkansas has stated that courts must follow statutory definitions "unless the definition is arbitrary, creates obvious incongruities in the statute, defeats a major purpose of the legislation or is so discordant to common usage as to generate confusion." *Bird v. Pan Western Corp.,* 261 Ark. 56, 60, 546 S.W.2d 417, 419 (1977). A major purpose of the Medical Malpractice Act was to meet a perceived insurance crisis and to regulate the tort liability of medical professionals for acts of medical malpractice. When we find, as we do here, a clash between the intent of the legislature and its own definitional section, we seek to harmonize the two. *Town of Scituate v. O'Rourke,* 103 R.I. 499, 239 A.2d 176 (1968). We, therefore, read the language "which proximately results in injury to the patient" as not having been intended to restrict the definition of "malpractice claim" to only those instances resulting in injury to patients. Instead, based on the causes of actions that were known to the legislature at the time this act was adopted, we find this language to refer to the legal standards of proximate cause, requiring causes of action to survive that test. We find the legislature intended to cover all causes of action arising in New Mexico that are based on acts of malpractice.

Other jurisdictions, faced with questions about the coverage of malpractice procedures to third-party actions have required those actions to proceed through malpractice. *See Faden v. Robbins,* 88 A.D.2d 631, 450 N.Y.S.2d 238 (1982) (chiropractor's third-party complaint against physicians for alleged malpractice on chiropractor's patient); *Gobble v. Baton Rouge Hosp.,* 415 So.2d 425 (La.Ct.App.1982) (loss of consortium claim to proceed through malpractice where alleged malpractice caused death); *Davis v. Acton,* 373 So.2d 952 (Fla. Dist.Ct.App.1979) (third-party complaint against consulting physician). While both New York and Florida have different statutory language than New Mexico, the Louisiana court interpreted language almost identical to that found in the New Mexico Medical Malpractice Act. *See* LA.Rev.Stat. Ann. §§ 40:1299.31–40:1299.48 (West 1977). The Louisiana court found language allowing claims to be brought by "a patient or his representative" did not restrict the class of persons who might bring an action. *Gobble,* 415 So.2d at 426. Even when the language reviewed by other courts has not been identical to that reviewed by this court, the thrust of those decisions has been similar. The Florida court wrote, "the gravamen of the third-party action is

predicated upon the allegation of professional negligence by a practicing physician." *Davis*, 373 So.2d at 953. We find this underlying logic compelling. *See also Welke v. Kuzilla*, 144 Mich.App. 245, 375 N.W.2d 403 (1985); *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983).

## SUMMARY

We find, as a matter of law, a duty was owed to the public who might be injured by a patient's impaired ability to drive when a doctor administered powerful drugs in his office. The doctor had an obligation to follow acceptable medical procedures. The Wilschinskys' cause of action falls within the purpose of the New Mexico Medical Malpractice Act and should be pursued according to its guidelines.

SOSA, C.J., concurs.

RANSOM, J., specially concurs.

SCARBOROUGH, J., dissents.

RANSOM, Justice (specially concurring).

I specially concur to express chagrin that seeds of further interprofessional discord needlessly may be sewn by certain language in the dissent. Justice Scarborough asserts that the majority opinion has extended the liability burden of physicians despite this Court's having rejected extension of the burden of lawyers to include liability to the courtroom adversary of an attorney's client. In point of fact, the opinion of this Court to which the dissent refers, *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 750 P.2d 118 (1988), was decided on public policy considerations that support preservation of a lawyer's special allegiance to a client in an *adversary* proceeding. As *Garcia* specifically observes, appropriate means do exist to redress a grievance concerning an attorney's alleged misconduct toward the adversary. "Within the action out of which a grievance arises, remedies are provided for the benefit and relief of parties wronged through reasonable reliance upon misrepresentations of an adversary's attorney." 106 N.M. at 763, 750 P.2d at 124.

It is certainly no extension of the liability burden of physicians under tort law to say that a doctor has a duty to refrain from optional outpatient administration of mind altering medication that, under the circumstances, gives rise to an unreasonable risk of injury to others. Reasonableness turns on the foreseeability of injury and the options available to the doctor in treatment of the patient. The conduct of the physician is measured by what a reasonably well-qualified doctor may do under similar circumstances.

With respect to the propriety of our accepting certification from the federal court, we have recently held by per curiam opinion that:

The intent of the certification of facts and determinative answer requirements is that this Court avoid rendering advisory opinions. Relative to the first requirement, it is sufficient if the certification of facts and the record contain the necessary factual predicates to our resolution of the question certified, and it is clear that evidence admissible at trial may be resolved in a manner requiring application of the law in question.

*Schlieter v. Carlos*, 108 N.M. 507, 508, 775 P.2d 709, 710 (1989). Here, it is absolutely clear from the record that evidence admissible at trial will require a jury instruction in accordance with the law of this opinion, and that the jury's findings in accordance with that law will determine the proportionate liability, if any, of the defendant doctor. Our resolution of this legal issue will materially advance the ultimate termination of the litigation. *See id.*

SCARBOROUGH, Justice, dissenting.

I respectfully dissent from the majority opinion. The majority expand the scope of a physician's duty to third parties and thus significantly enlarge a physician's potential liability. In assessing the consequences of their holding, the majority conclude that "the burden on the doctor's treatment decisions is negligible." In fact, one can readily assume just the opposite: the burdens already imposed on treatment decisions by physicians have driven many from the prac-

tice of medicine, and the majority opinion will further exacerbate the existing medical liability crisis. Along this same line of reasoning, the majority note that we live in a "risk-allocative" society. While this may be true, consideration of such issues is a task best left to the legislature rather than to the judiciary. There are no data before us from which this Court can appropriately determine "risk-allocative" issues.

The majority assume that there are facts before us. This is not so. There has been no fact finding by the trial court. We do not know what the facts are or will be. The majority opinion, therefore, is little more than an advisory opinion decided in a factual vacuum in contravention of our longstanding rule that appellate decisions be fact specific.

The majority's assumption that the "recent growth" of new and unforeseen practices by physicians somehow justifies the destruction of patient-client liability constraints finds no support in the facts before us, or in any facts of which we could properly take judicial notice. From time immemorial, patients have been treated in their homes or in the offices of physicians and clinics of physicians. There is no factual basis upon which this court can extend tort liability of physicians to include third parties.

We have declined to burden attorneys with tort liability to third parties. *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 750 P.2d 118 (1988). This Court in *Garcia v. Rodey* was not prepared to extend the legal duty of an attorney to non-client thirty parties who may be injured by the services or advice of the attorney to this client. I am not prepared to extend the liability burden of physicians which the majority opinion would impose.

While I agree with the majority that the limits imposed on a physician's liability are appropriately set by the Medical Malpractice Act, I believe this issue is not ripe for our resolution. The question of liability limits is not before us by certification, and the issue has not been addressed by the parties in any manner.

My disagreement with the majority opinion notwithstanding, I further conclude that the instant case is not properly before us. Three legal questions were certified to this Court for our response, but the certification request entered by the U.S. District Court was not accompanied by a sufficient factual predicate in the form of findings or stipulated facts. And for this reason I would decline to accept certification.

In New Mexico, the process of certification from federal courts is governed by SCRA 1986, 12–607, which implements NMSA 1978, Section 34–2–8 (Repl.Pamp. 1981). SCRA 12–607 requires a certification request to include "either a statement by the certifying court of the facts relevant to the question certified, showing the nature of the controversy in which the questions arose, or a stipulation of such facts by the parties, which has been approved by the certifying court." SCRA 12–607(C)(3). The certification request before us does not include a stipulation of the facts, nor does the certifying court provide sufficient non-disputed facts relevant to the questions of law certified to us. It is essential that the material facts have been either agreed upon or determined by the certifying court before we attempt to form an authoritative statement of New Mexico law on the issues. I strongly disfavor giving an advisory opinion unless it is fact intensive.

I find considerable support for my conclusion. "Certification would be a pointless exercise unless the state court's answers are regarded as an authoritative and binding statement of state law." 17A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4248 at 179 (2d ed. 1988). Without sufficient, nondisputed facts we cannot authoritatively answer the questions of law before us. I would not go as far in this regard as the Supreme Court of Wyoming which has said it will not answer a certified question of state law "until there is nothing left for the [federal] court to do but apply our answer to the question and enter judgment consistent with the answer or answers." *In re Certified Question from the District Court*, 549 P.2d 1310, 1311 (Wyo.1976). Instead, I

would look to the Supreme Court of Maine, which was one of the first state courts to adopt certification procedures more than twenty-five years ago. In 1966, the Maine court held:

> If we are to participate and yet not render purely advisory opinions, we think it will be incumbent upon us to respond to questions only when it is apparent from the certification itself that all material facts have been either agreed upon or found by the court and that the case is in such posture in all respects that our decision as to the applicable Maine law will in truth and in fact be "determinative of the cause" as the statute conferring jurisdiction upon us requires.

*In re Richards*, 223 A.2d 827, 833 (Me. 1966). *See also* R. Field, V. McKusick & L. Wroth, *Maine Civil Practice* § 76B Commentary (1967 Supp.).

The absence of sufficient nondisputed facts occurs most often in certifications from federal district courts. Certification requests from federal appellate courts will normally include findings of facts. The burden to provide sufficient nondisputed facts rests with the district courts:

> Due regard for the interests of the states in conserving their judicial resources requires that the district courts be careful in their use of certification procedures. *This is particularly true in cases in which the unclear legal issue is identified in advance of trial and there are factual disputes to be resolved.* (Emphasis added)

1A J. Moore, W. Taggart, A. Vestal, J. Wicker & B. Ringle, *Moore's Federal Practice* § 0.203[5] Pt. 2 at 2162 (2d ed. 1989). Whether a certification request provides sufficient nondisputed facts must of necessity be determined on a case-by-case basis. An example of an effective certification request from a district court to this Court can be seen in *Hamilton Test Systems, Inc. v. City of Albuquerque*, 103 N.M. 226, 704 P.2d 1102 (1985), which provided stipulated facts. This Court should not make common law in a vacuum. It is, therefore, imperative that we preserve the procedural parameters for certification we have set forth in SCRA 1986, 12–607.

Absent a certification request providing sufficient, nondisputed facts, I do not believe we should contemplate rendering an opinion in the instant case. I dissent.