**Certiorari Granted, July 20, 2012, No. 33,635**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-073**

**Filing Date: May 9, 2012**

**Docket No. 30,475**

**BRYANNA PEARL BAKER,**

> **Plaintiff-Appellant,**

**v.**

**STEPHANIE HEDSTROM, M.D.;
SOUTHWEST PERINATOLOGY;
WILLIAM RAMIREZ, M.D.,
LEE C. CARUANA, M.D.; FAMILY
PRACTICE ASSOCIATES, P.C.;
MISBAH ZMILY, M.D.; MISBAH
ZMILY, P.C.; CORDELL HALVERSON, M.D.;
LORENE VALDEZ-BOYLE, M.D.; SAN
MIGUEL HOSPITAL CORP., d/b/a
ALTA VISTA REGIONAL HOSPITAL;
THE BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO, as Trustees
of the University of New Mexico Health &
Sciences Center; and JOHN DOES # 1-20;
and JANE DOES # 1-20,**

> **Defendants-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Abigail Aragon, District Judge**

**consolidated with**

**Docket No. 30,491**

**LORRICE GORDON,**

> **Plaintiff-Appellee,**

**v.**

**ABQ HEALTH PARTNERS, L.L.C.,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
Alan M. Malott, District Judge

**consolidated with**

**Docket No. 30,639**

**PAUL CAMPOS, as Personal Representative**
**of the Estate of Cheri Wilson, deceased,**

      **Plaintiff-Appellant,**

**v.**

**LORETTA CONDER, M.D.;**
**LORETTA CONDER, M.D., P.C.;**
**a Corporation, OMKAR TIKU, M.D.;**
**and OMKAR TIKU, P.C., a Corporation,**

      **Defendants-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
Sarah M. Singleton, District Judge

McGinn, Carpenter, Montoya
  & Love, P.A.
Tyler J. Atkins
Randi McGinn
Albuquerque, NM

The Kauffman Firm
Cid Lopez
Albuquerque, NM

for Appellant Bryanna Baker

Law Offices of Felicia C. Weingartner, P.C.
Felicia C. Weingartner

Albuquerque, NM

The Kauffman Firm
Cid Lopez
Albuquerque, NM

for Appellee Lorrice Gordon

Garcia & Vargas, LLC
Ray M. Vargas, II
Santa Fe, NM

The Law Office of Stephen Durkovich
Stephen Durkovich
Santa Fe, NM

for Appellant Paul Campos
Hinkle, Hensley, Shanor & Martin, L.L.P.
Dana S. Hardy
William P. Slattery
Santa Fe, NM

for Appellees Loretta Conder, M.D. and Loretta Conder, M.D.,P.C.

Allen Shepherd Lewis Syra & Chapman PA
Edward W. Shepherd
Albuquerque, NM

for Appellees Omkar Tiku, M.D. and Omkar Tiku P.C.

Lorenz Law
Alice T. Lorenz
Albuquerque, NM

for Appellant ABQ Health Partners, L.L.C.

Butt Thornton & Baehr PC
Emily A. Franke
W. Ann Maggiore
Albuquerque, NM

for Appellees Stephanie Hedstrom, M.D. and Southwest Perinatology, P.C.

Lorrie A. Krehbiel

Melanie Frassanito
Albuquerque, NM

for Appellees Lee C. Caruana, M.D. and Family Practice Associates, P.C.

Sharp Law Firm
Lynn S. Sharp
Albuquerque, NM

for Appellant ABQ Health Partners, L.L.C.

Miller Stratvert
Jennifer D. Hall
Albuquerque, NM

for Appellees Misbah Zmily M.D. and Misbah Zmily, P.C.

**OPINION**

**CASTILLO, Chief Judge.**

**{1}**     In these consolidated cases, we must determine if Defendants are health care providers as defined in the New Mexico Medical Malpractice Act (MMA), NMSA 1978, Sections 41-5-1 to -29 (1976, as amended through 2008). The MMA defines "health care provider" as "a person, corporation, organization, facility[,] or institution licensed or certified by this state to provide health care or professional services as a doctor of medicine, hospital, outpatient health care facility, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist[,] or physician's assistant[.]" Section 41-5-3(A). Health care providers must qualify under the MMA before they are entitled to its benefits. *See* § 41-5-5; *see also Roberts v. Sw. Cmty. Health Servs.*, 114 N.M. 248, 250, 837 P.2d 442, 444 (1992).

**{2}**     Plaintiffs are individuals or the estate of a deceased individual; all have asserted medical malpractice claims against Defendants and their agents. Defendants are business entities that are neither hospitals nor outpatient health care facilities involved in the treatment of Plaintiffs. Relying on the plain language of Section 41-5-3(A), Plaintiffs assert that even though Defendants procured coverage under the MMA, they may not invoke the protections of the MMA because they are not "health care provider[s]" as that term is defined in the MMA. Defendants respond that Plaintiffs' plain language interpretation is too restrictive and contrary to the Legislature's intention that coverage under the MMA be widely available to as many providers of health care services as possible. Defendants ask us to define the term "health care provider" broadly and to conclude that they fall within the scope of that definition. We reject Plaintiffs' plain language interpretation, agree with Defendants' legislative intent arguments, and conclude that Defendants are health care providers.

4

## I. BACKGROUND

**{3}** In this case, we have consolidated three interlocutory appeals from three different judicial districts. Defendants here include several professional corporations that are incorporated under the New Mexico Professional Corporations Act, NMSA 1978, Sections 53-6-1 through -14 (1963, as amended through 2001), and a foreign limited liability company registered in Delaware. All obtained insurance coverage and paid the surcharges necessary to be qualified health care providers under the MMA; the business entities were properly licensed; and the Superintendent of Insurance has listed them all and treated them all as qualified health care providers. We briefly review the facts and procedural posture underlying each of the three cases.

**{4}** Gordon Case: Plaintiff Lorrice Gordon filed suit alleging permanent injuries from a bowel obstruction following an emergency appendectomy that had required a second surgery and a prolonged hospital stay. The case was filed in the Second Judicial District Court against Lovelace Health System, Inc.; the surgeon who performed the appendectomy; and the surgeons's employer, ABQ Health Partners, L.L.C. (the LLC), a foreign limited liability company organized under the laws of the State of Delaware. The LLC filed a motion to dismiss or stay, arguing that it had procured insurance under the MMA, that it was entitled to the benefits of the MMA, and that it was entitled to dismissal because Gordon had failed to comply with the procedural requirements of the MMA. Gordon responded that the LLC was not entitled to the benefits of the MMA because it was not a "health care provider." The district court agreed with Gordon, denied the motion to dismiss, and certified the matter for interlocutory review.

**{5}** Baker Case: Plaintiff Bryanna Baker filed suit in the Fourth Judicial District Court alleging malpractice related to her pregnancies, heart attack, and resulting permanent heart damage. Defendants included the doctors who treated her and the professional corporations under which those doctors practice medicine. Thereafter, she moved for summary judgment, arguing that the professional corporations named as defendants in her suit could not benefit from the damage limitations in the MMA—despite the fact that they had procured insurance under the MMA—because they are not health care providers. The district court rejected Baker's motion, determined that the defendant corporations are health care providers, and certified the ruling for interlocutory review.

**{6}** Campos Case: Cheri Wilson had her gall bladder removed and died three days after the procedure. Paul Campos, the personal representative of Wilson's estate, filed a wrongful death action in the First Judicial District against the doctor who performed the procedure, against Wilson's primary care physician whom Wilson had consulted after the procedure, and against the professional corporations under which both doctors practice medicine. The defendant professional corporations had obtained insurance under the MMA and filed motions to dismiss, arguing that Wilson's estate failed to comply with the procedural requirements of the MMA. Campos opposed the motion and argued that the corporations are not "health care provider[s]" as that term is defined in the MMA and, thus, were not

5

entitled to the benefits of the MMA. The district court rejected this argument, granted the motion to dismiss, and certified the matter for interlocutory review. This Court granted the interlocutory appeals of the three cases and, upon the stipulated request of the parties, consolidated them because they all involve a similar question.

## II.    DISCUSSION

**{7}**    The sole issue before us is whether the definition of "health care provider" as set forth in Section 41-5-3(A) of the MMA includes Defendant professional corporations and the foreign limited liability company. Relying on *Cummings v. X-Ray Assoc. of New Mexico, P.C.*, 1996-NMSC-035, 121 N.M. 821, 918 P.2d 1321, and *Otero v. Zouhar*, 102 N.M. 482, 697 P.2d 482 (1985), *overruled on other grounds by Grantland v. Lea Reg'l Hosp., Inc.*, 110 N.M. 378, 796 P.2d 599 (1990), Defendants assert that no New Mexico appellate court has ever found that a corporation or limited liability company was precluded from being a qualified "health care provider" under the MMA. While this may be the case, it does not answer our question. In *Cummings*, our Supreme Court held that the MMA's three-year statutory limit was constitutional and that it barred plaintiff's suit against the defendant corporation. *Otero*, on the other hand, was a case in which the Superintendent of Insurance incorrectly informed plaintiff that defendant limited liability corporation was not a qualified health care provider. *Otero*, 102 N.M. at 486, 697 P.2d at 486. Consequently, plaintiff's application for review of his claims was not filed before the statute of limitations had run. *Id.* Our Supreme Court concluded that plaintiff was entitled to rely on the representations of the superintendent and, because the superintendent conveyed incorrect information, the Court reinstated plaintiff's claims against defendant. *Id.* at 487. To the extent that Defendants argue that our Supreme Court affirmatively decided that the corporate entities in *Cummings* and *Otero* were health care providers, their reliance on those cases is misplaced. Neither *Cummings* or *Otero* addressed the specific question before us today. Accordingly, the question presented by the parties in the case before us has not yet been considered by New Mexico appellate courts, and it is therefore one of first impression.

**{8}**    We begin our review by establishing our standard of review and then set out the rules of statutory construction that guide our analysis.

### A.    Standard of Review and Rules of Statutory Construction

**{9}**    This case presents us with a question of statutory interpretation. "The meaning of language used in a statute is a question of law that we review de novo." *United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 2010-NMSC-030, ¶ 7, 148 N.M. 426, 237 P.3d 728 (internal quotation marks and citation omitted).

**{10}**    "The principal objective in the judicial construction of statutes is to determine and give effect to the intent of the [L]egislature." *Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998-NMSC-020, ¶ 28, 125 N.M. 401, 962 P.2d 1236 (internal quotation marks and citation omitted). We rely on rules of construction as aids in determining legislative

intent, *State v. Martinez*, 92 N.M. 291, 293, 587 P.2d 438, 440 (Ct. App. 1978), and must interpret Section 41-5-3(A) "as the Legislature understood it at the time it was enacted." *Montoya v. City of Albuquerque*, 82 N.M. 90, 94, 476 P.2d 60, 64 (1970).

**{11}** "The first guiding principle in statutory construction dictates that we look to the wording of the statute and attempt to apply the plain meaning rule, recognizing that [w]hen a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *United Rentals Nw., Inc.*, 2010-NMSC-030, ¶ 9 (alteration in original) (internal quotation marks and citation omitted). We may depart from the plain meaning of the language of a statute, however, to "correct a mistake or an absurdity that the Legislature could not have intended[.]" *Regents of the Univ. of N.M.*, 1998-NMSC-020, ¶ 28.

**{12}** "It is fundamental that statutes will be construed so that their application will be neither absurd nor unreasonable." *Midwest Video v. Campbell*, 80 N.M. 116, 119, 452 P.2d 185, 188 (1969). Similarly, "[w]e will not construe a statute to defeat [its] intended purpose." *Padilla v. Montano*, 116 N.M. 398, 403, 862 P.2d 1257, 1262 (Ct. App. 1993). "If the language of a statute renders its application absurd or unreasonable, it will be construed according to its obvious spirit or reason." *State v. Ortiz*, 78 N.M. 507, 510, 433 P.2d 92, 95 (Ct. App. 1967). This may necessitate "the rejection of words and the substitution of others." *Montoya v. McManus*, 68 N.M. 381, 389, 362 P.2d 771, 776 (1961). We may consider "the structure, context, history[,] and background of the statute, as well as the likely policy implications of various constructions." *State v. Burke*, 2007-NMCA-093, ¶ 7, 142 N.M. 218, 164 P.3d 99, *rev'd on other grounds by* 2008-NMSC-052, 144 N.M. 772, 192 P.3d 767.

## 1.      Plain Meaning

**{13}** Neither party argues that there is ambiguity in Section 41-5-3(A). As previously mentioned, Section 41-5-3(A) defines "health care provider" as "a person, corporation, organization, facility[,] or institution licensed or certified by this state to provide health care or professional services as a doctor of medicine, hospital, outpatient health care facility, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist[,] or physician's assistant[.]" Plaintiffs emphasize the terms "licensed or certified" and the term "as" and claim that the plain meaning of Section 41-5-3(A) encompasses two distinct and discrete groups: persons licensed as (1) doctors, (2) doctors of osteopathy, (3) chiropractors, (4) podiatrists, (5) nurse anesthetists, and (6) physician assistants *and* corporations, organizations, facilities, or institutions licensed or certified as (1) hospitals or (2) outpatient health care facilities. According to Plaintiffs, the definition of "health care provider" encompasses these six persons and two types of business entities and nothing more.

**{14}** In support of this interpretation, Plaintiffs point out that corporations cannot be licensed to provide health care or professional services *as* doctors, physician assistants, chiropractors, podiatrists, nurse anesthetists, or physician's assistants. They correctly argue

that only persons can be licensed to provide those health services. *See* NMSA 1978, § 61-6-11 (2005) (governing medical licensure); NMSA 1978, § 61-10-3 (1975) (governing licensure in the field of osteopathy); NMSA 1978, § 61-4-6 (2008) (governing licensure in the chiropractic field); NMSA 1978, § 61-8-3 (1998) (governing licensure in the field of podiatry); NMSA 1978, § 61-6-10.3 (2003) (governing licensure of anesthetist assistants); NMSA 1978, § 61-6-7 (2003) (governing licensure of physician assistants).

**{15}**     Plaintiffs assert that there is no dispute that Defendant corporations are not one of the six types of persons nor are they one of the two types of business entities encompassed by the definition of "health care provider."  Thus, according to Plaintiffs, Defendants cannot qualify for coverage under the MMA.

**{16}**     Defendants have not offered a compelling alternative reading of the plain meaning of the text of Section 41-5-3(A).   They merely rely on the fact that the words "corporation[s]" and "organization[s]" appear in the definition of "health care provider" and claim that everyone who addressed Section 41-5-3(A) read it as allowing business entities to qualify. This approach ignores the terms emphasized by Plaintiffs. Moreover, Defendants appear to concede that the grammar and punctuation of Section 41-5-3(A), if read literally, would exclude them from qualifying as a "health care provider."

**{17}**     Were we to look only at the literal language in Section 41-5-3(A) and nothing else, we would agree with Plaintiffs' interpretation of the term "health care provider" and further that Defendants do not fall within the definition of that term.  But our task does not end here.  We must exercise caution in applying the plain meaning rule.  "Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *State ex rel. Helman v. Gallegos*, 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994).  We examine the overall structure of the statute and its function in the comprehensive legislative scheme.  Accordingly, we decline to engage in a literal reading because,  in our view, such an interpretation would conflict with the overall legislative purpose underlying the MMA. *See Eldridge v. Circle K Corp.*, 1997-NMCA-022, ¶ 29, 123 N.M. 145, 934 P.2d 1074 ("[O]ur task is not to apply language literally when it would lead to counterproductive, inconsistent, and absurd results; we must harmonize the statutory language to achieve the overall legislative purpose.").  "[W]e also consider the history and background of the statute." *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939.

**{18}**     In the consolidated cases before us, a plain meaning interpretation would make little sense in light of the historical circumstances that led to the MMA's enactment and the structure of the MMA itself. *Burke*, 2007-NMCA-093, ¶ 7 (stating that a court may consider the history and background of a statute as well as its structure when called upon to construe it).  We explain.

**2.       Legislative Purpose and History**

8

**{19}** We begin with a short history of the events leading to the filing of these cases. The MMA was enacted in 1976 and, since then, a variety of different business entities that are neither hospitals nor outpatient health care facilities have paid for liability coverage under the MMA and have been covered. The question of whether the term "health care provider" as defined in the MMA encompasses business entities other than hospitals and outpatient health care facilities has never been specifically addressed by a New Mexico appellate court. Nor had it been addressed by the Insurance Department until 2009 when the then-serving New Mexico Superintendent of Insurance issued a memorandum expressing his view that these types of business entities do not fall within the definition of "health care provider." Disagreeing with the determination, a doctor and a health insurance company filed a suit against the superintendent for injunctive relief and declaratory judgment. That lawsuit resulted in a temporary restraining order that required the superintendent to rescind his memorandum and to continue permitting business entities other than hospitals and outpatient health care facilities to procure coverage.

**{20}** In both the 2010 and 2011 legislative sessions, proposed legislation designed to address the definition of "health care provider" was introduced. The 2010 legislation died during the session, while the 2011 legislation passed both houses but was vetoed by the Governor.

**{21}** The asserted purpose of the MMA is "to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers in New Mexico." Section 41-5-2. This asserted purpose and the historical circumstances leading to the enactment of the MMA have been examined in detail.

**{22}** "The [MMA] was enacted by the [L]egislature in order to meet an insurance crisis [and] to promote health care in New Mexico by providing a framework for tort liability with which the insurance industry could operate." *Wilschinsky v. Medina*, 108 N.M. 511, 516, 775 P.2d 713, 718 (1989). The insurance crisis that prompted the enactment of the MMA arose out of a nationwide perception that medical malpractice insurance was increasingly becoming unavailable. Ruth L. Kovnat, *Medical Malpractice Legislation in New Mexico*, 7 N.M. L. Rev. 5, 7 (1976-77). The specific event that triggered concern in New Mexico was the announced withdrawal in 1975 of the Travelers' Insurance Company as the underwriter of the New Mexico Medical Society's professional liability program. *Id.* Travelers' withdrawal jeopardized health care providers' protection against liability claims and, in turn, compromised the legal remedies available to health care consumers injured by the negligence of health care providers. *Id.* at 7-8. Travelers' reason for withdrawing was "simply that there was no profit in writing medical liability insurance and that they would prefer to be out of the business altogether." *Id.* at 8.

**{23}** The MMA addressed the crisis by making malpractice insurance available and by providing incentives in the form of benefits to ensure widespread participation. *Cummings*, 1996-NMSC-035, ¶ 29; *Roberts*, 114 N.M. at 249-50, 837 P.2d at 443-44. The benefits of participation in the MMA are significant and numerous. *See generally Lester ex rel.*

9

*Mavrogenis v. Hall*, 1998-NMSC-047, ¶ 11, 126 N.M. 404, 970 P.2d 590. In order to assure New Mexicans' access to medical care, the Legislature limited the liability of health care providers by enacting damage caps, a shorter three-year statute of limitations, and a mandatory evaluation process conducted by a medical review commission. *Id.* In short, the MMA restricted and limited plaintiffs' rights under the common law. *See Wilschinsky*, 108 N.M. at 516, 775 P.2d at 718.

**{24}** We now turn to some of the specific provisions. Section 41-5-5(C) of the MMA limits the benefits of the MMA to those health care providers willing to accept the burdens of qualification. The burdens of qualification include, but are not limited to, proof by health care providers of insurance coverage of $200,000 per occurrence and surcharges to maintain the patients' compensation fund. *Cummings*, 1996-NMSC-035, ¶ 28. Any judgment or settlement that awards an amount greater than $200,000 is paid by the fund. *Id.*

**{25}** These specific burdens—the minimum insurance requirement and the levying of surcharges—along with the creation and existence of the patient's compensation fund are significant and central aspects of the MMA. Our Supreme Court has previously observed that, by establishing minimum levels of insurance and by levying a surcharge to sustain the patient's compensation fund, the MMA "achieves the legislative purposes of assuring that health care providers are adequately insured so that patients may be reasonably compensated for their malpractice injuries." *Id.* This is but another way of saying that these provisions go a long way toward fulfilling the asserted purpose of the MMA.

**{26}** From 1976 to 2009, the New Mexico Department of Insurance permitted physician-owned corporations or organizations to obtain insurance coverage and thus become qualified health care providers. For this thirty-three-year period, there was no action by the Legislature indicating that this interpretation of the statute was incorrect. *See In re Sleeper*, 107 N.M. 494, 498, 760 P.2d 787, 791 (Ct. App. 1988) ("[T]he more long-standing the state engineer's interpretation of construction of the statutes without amendment by the [L]egislature, the more likely that the state engineer's interpretation reflects the [L]egislature's intent."); *but see Brown v. Gardner*, 513 U.S. 115, 121 (1994) (stating that legislative silence lacks persuasive significance).

**{27}** Plaintiffs have a different view of the purpose of the MMA. They focus on the manner in which health care was rendered at the time the MMA was enacted and assert that, at that time, medical services in New Mexico were primarily rendered by individual doctors and by locally owned hospitals. Thus, Plaintiff's claim that the Legislature intended only those doctors and those entities to be eligible to qualify as "health care providers." Other business or corporate entities, Plaintiffs claim, "were not of concern" and, thus, were purposefully excluded from qualifying. In support of this view, Plaintiffs direct us to the affidavit of Terry M. Word, an attorney who served on the "New Mexico Medical Society/New Mexico Bar Association Committee" and "the informal Medical Society/Bar Association Liaison Committee" both of which, Plaintiffs claim, "provided guidance and policy assistance to the New Mexico Legislature on the [MMA]." Word's view of the

10

history and purpose of the MMA is identical to Plaintiffs' position.

**{28}** We are unpersuaded by Plaintiffs' legislative history and intent arguments and the authority they cite in support of those arguments. Further, the Word affidavit has no bearing here as, generally, not even statements of legislators are considered competent evidence in determining legislative intent. *Cf. Gallegos*, 117 N.M. at 355-56, 871 P.2d at 1361-62 ("Statements of legislators, *after* the passage of the legislation, however, are generally not considered competent evidence to determine the intent of the legislative body enacting a measure." (internal quotation marks and citation omitted)). Word only provided policy assistance to the Legislature and therefore was at least one step removed from the legislative process.

**{29}** More critically, we are unable to reconcile Plaintiffs' position that the Legislature intended only a specific pool of health care providers to be eligible for coverage under the MMA with the asserted purpose of the MMA: to protect the health of New Mexicans by solving the problem of the unavailability of medical malpractice insurance. As noted above, the Legislature went so far as to provide significant incentives to ensure widespread participation in the MMA. Plaintiffs' view that the MMA was intended to be restrictive does not make sense in light of case law that supports the conclusion that our Legislature intended the MMA to be broadly applicable. *Cummings*, 1996-NMSC-035, ¶ 29 (stating that the Legislature "provided a number of incentives to assure participation by health care providers in the burdens of qualification under the [MMA]").

**{30}** Plaintiffs attempt to bolster their legislative intent argument by relying on the canon of statutory construction known as *expressio unius est exclusio alterius*—the inclusion of one thing implies the exclusion of another. *See generally Fernandez v. Española Pub. Sch. Dist.*, 2005-NMSC-026, ¶ 6, 138 N.M. 283, 119 P.3d 163 (discussing the *expressio unius est exclusio alterius* canon of construction). They contend that, because the definition of "health care provider" includes several specific entities, the Legislature must have intended that all other entities not specifically listed were to be excluded from the definition of "health care provider." We disagree.

**{31}** We are persuaded that the Legislature intended, for sound and identifiable policy reasons, that the term "health care provider" be as broadly construed as possible. We have rejected Plaintiffs' view regarding legislative intent. We also reject Plaintiffs' *expresio unius est exclusio alterius* argument as inconsistent with what we believe our Legislature intended regarding the scope of the definition of "health care provider." As stated above, our principal objective is to construe Section 41-5-3(A) so as to "give effect to the intent of the [L]egislature." *Regents of the Univ. of N.M.*, 1998-NMSC-020, ¶ 28 (internal quotation marks and citation omitted).

**{32}** Finally, we observe that Plaintiffs' interpretation would, as Defendants argue, give rise to significant constitutional issues grounded in contract, due process, and equal protection. Our case law requires that we construe statutes to avoid such issues. *Lovelace*

11

*Med. Ctr. v. Mendez*, 111 N.M. 336, 340, 805 P.2d 603, 607 (1991) ("It is, of course, a well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions.").

**{33}** In sum, we determine that a plain meaning construction of Section 41-5-3(A) is inappropriate. We agree with Defendants' interpretation of what our Legislature intended as to the scope of the definition of "health care provider." We now address the remaining arguments on appeal.

## B.  Remaining Arguments

**{34}** The parties have presented a number of other arguments that we find unpersuasive. We deal with them summarily.

**{35}** Defendants direct us to two Attorney General opinions, one issued in 1977, the other in 1987, that they claim are pertinent to the issue before us. This is not the case. The 1977 opinion examines the plain language of the MMA and advises that "[a] corporation licensed to provide professional services as specified in [Section 41-5-3(A)] is a health care provider." While we agree that this may have been the general understanding at the time, we observe that the opinion ignores the term "as" in reaching its conclusion. Our plain meaning reading of Section 41-5-3(A) would allow only two types of business entities to qualify as health care providers: those licensed to provide health care or professional services *as* (1) hospitals or (2) outpatient health care facilities. But this is immaterial because we have held that the plain meaning of the statute is not what the Legislature intended and that each of the Defendant business corporations is indeed a "health care provider" as contemplated by the MMA.

**{36}** The 1987 opinion addresses whether "a corporation, organized and controlled by non-physicians, [may] provide medical services to the general public through employed physicians[.]" The Attorney General concluded yes with some qualification. The question answered by the 1987 opinion and the question before us are totally different; consequently, we fail to see how the resolution of this question answered in the opinion bears on the scope of the definition of "health care provider." For this reason, we conclude that the 1987 opinion is not helpful.

**{37}** Defendants also direct us to legislation proposed during the 2011 New Mexico legislative session that would have amended the definition of "health care provider" to include business entities other than hospitals or outpatient health care facilities. *See* H.B. 267, 2011 Leg., 50th Sess. (N.M. 2011); S.B. 333 2011 Leg., 50th Sess. (N.M. 2011). These bills passed both the Senate and the House but were vetoed by the Governor. Defendants argue that this legislation is indicative of legislative intent. We disagree. The amendments are not law, *Regents of the Univ. of N.M.*, 1998-NMSC-020, ¶ 32 (declining to consider statutory provisions that were never enacted when attempting to discern legislative intent), and do not give us any indication of what the [L]egislature intended at the time the MMA

was enacted. *See Montoya*, 82 N.M. at 94, 476 P.2d at 64 (observing that we must discern legislative intent at the time of enactment). The legislative amendments are also immaterial.

**{38}** Defendants rely on the rule of statutory construction known as administrative gloss. This canon was discussed by our Supreme Court in *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 9, 126 N.M. 413, 970 P.2d 599, which Defendants cite. There, our Supreme Court described the doctrine as follows: "[a]n administrative gloss is placed on an ambiguous clause of a zoning ordinance when those responsible for its implementation interpret the clause in a consistent manner and apply it to similarly situated applicants over a period of years without legislative interference." *Id.* (internal quotation marks and citation omitted). In *Smith v. Bd. of Cnty. Comm'r*, 2005-NMSC-012, ¶ 32, 137 N.M. 280, 110 P.3d 496, our Supreme Court explained that adherence to the doctrine precludes a "kind of result-oriented reinterpretation of zoning rules." Our research reveals that the canon of administrative gloss is applicable only where the provision giving rise to the dispute is ambiguous. *See Nash Family Inv. Props. v. Town of Hudson*, 660 A.2d 1102, 1108 (N.H. 1995) ("Assuming [the administrative gloss] doctrine applies . . . the plaintiffs' point must fail because they allege no ambiguity in the relevant ordinances."). The parties have not argued that Section 41-5-3(A) is ambiguous. Thus, the doctrine of administrative gloss is inapplicable here.

**{39}** Both parties cite to opinions from other jurisdictions where courts were required to interpret their state statute that is equivalent to the MMA and address issues similar to those raised here. Defendants cite to *Campbell v. MacGregor Med. Ass'n*, 966 S.W.2d 538 (Tex. Ct. App. 1997), *rev'd in part on other grounds by MacGregor Med. Ass'n v. Campbell*, 985 S.W.2d 38 (Tex. 1998), while Plaintiffs direct us to *Turner v. Sheldon D. Wexler, D.P.M., P.C.*, 418 S.E.2d 886 (Va. 1992). These cases are, in our view, of minimal significance because the conclusions reached by the Texas and Virginia courts are based on the unique language and interpretation of their respective statutes. This appeal requires us to examine the language of the MMA, the purposes and historical circumstances giving rise to the enactment of the MMA, the structure of the MMA, and to apply the rules of statutory construction as adopted in New Mexico.

## III.    CONCLUSION

**{40}** "When we find, as we do here, a clash between the intent of the [L]egislature and its own definitional section, we seek to harmonize the two." *Wilschinsky*, 108 N.M. at 517, 775 P.2d at 719. We decline to read the definition of "health care provider" literally. This would restrict eligibility for coverage under the MMA in a manner our Legislature could not have intended. The purpose of the MMA, the historical circumstances leading to its enactment, and the structure of the MMA persuade us that the Legislature intended to include Defendants in the definition of "health care provider" and, thus, to allow them to qualify for coverage under the MMA. Thus, we reverse the district court's denial of Defendant's motion to dismiss in Gordon, and we affirm the orders of the district courts in Baker and Campos.

**{41}** **IT IS SO ORDERED.**

_____

**CELIA FOY CASTILLO, Chief Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Judge**

_____

**LINDA M. VANZI, Judge**

**Topic Index for _Baker v. Hedstrom_, Docket Nos. 30,475/30,491/30,639**

**APPEAL AND ERROR**
Interlocutory Appeal
Standard of Review

**STATUTES**
Interpretation
Legislative Intent
Rules of Construction

**TORTS**
Medical Malpractice